**292 A.2d 230.**

## E. Turgeon Construction Co., Inc. *vs.* Elhatton Plumbing & Heating Company, Inc., *et al.*

JUNE 30, 1972.

Present: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. This is an interpleader action wherein the receiver of an insolvent corporation and one of the insolvent's creditors both claim a sum of money which is presently on deposit in the registry of the Superior Court. A hearing on the conflicting claims was held before a justice of the Superior Court. He found for the creditor and the receiver appeals. Hereafter, we shall refer to the plaintiff as "Turgeon"; the insolvent corporation, Elhatton Plumbing & Heating Company, Inc., as "Elhatton"; the creditor, National Plumbing and Heating Supply Corp., as "National" and the Small Business Administration as "S.B.A."

Sometime prior to 1968, Brown University chose Turgeon as the builder of its graduate center complex. Turgeon, in turn, hired Elhatton as the project's plumbing subcontractor. The subcontract provided for a system of progressive payments based upon the percentage of work completed with a certain percentage of the contract price being retained by Turgeon and not payable until the plumbing installation had been completed. The final contract price for the plumbing work amounted to about a half-million dollars with the retainage due Elhatton being just in excess of $20,765. Certain costs were deducted from that amount so that the actual sum deposited in the registry was $20,182.

National furnished plumbing equipment to Elhatton. Elhatton was not prompt in paying for such supplies. In December, 1964, Elhatton received a S.B.A. loan of $50,000. It secured payment of this debt by giving the federal agency a mortgage on its real estate and a security interest in all of its then present and after-acquired inventory and accounts receivable. Some $12,000 to $13,000 of the mortgage proceeds were used to reduce the debt owed National. The fiscal

relief afforded by S.B.A. was temporary and Elhatton began its slow steady slide into insolvency.

In March, 1968, National insisted that Elhatton's officers personally guarantee payment of the corporation's account. Such a guarantee was signed. Things continued to worsen. At the end of June, 1968, Elhatton owed National about $50,000. Of this amount, $10,000 represented plumbing equipment furnished to the graduate center. The Brown project was in its final stages. All that was needed to complete Elhatton's subcontract was the installation of such basic but necessary fixtures as toilets, washbasins and towel bars.

At this juncture, National informed Elhatton that it would not furnish any more fixtures unless the insolvent assigned to National all its rights to the retainage being held by Turgeon. On July 3, 1968, the vice-president of Elhatton executed an assignment to National of "all monies now due or which will be due as retainer" on the plumbing subcontract and authorized Turgeon to pay the retainage to National. National did not file with the office of the Secretary of State a financing statement showing the assignment. The plumbing work was completed.

In January, 1969, Elhatton was adjudged to be insolvent and a receiver was appointed to liquidate its assets. Two months later, Turgeon filed its interpleader complaint.

After this action had commenced, S.B.A. intervened and presented proof that it held a perfected security interest in all of Elhatton's accounts receivable. An order was entered authorizing the clerk to pay $10,514[1] to S.B.A. The deduction of this sum and other costs have reduced the amount

---

[1]Throughout this opinion, we have rounded out the amounts mentioned to the nearest dollar.

of the retainage presently available to the receiver, or National, to $9,794 plus interest.[2]

As we proceed to consider this appeal, it should be kept in mind that, pursuant to the appropriate provisions of the Uniform Commercial Code, a security interest is subordinate to the rights of a person who becomes a lien creditor without knowledge of the security interest before it is perfected and a receiver ordinarily has the status of a lien creditor. General Laws 1956 (1969 Reenactment) §6A-9-301(1)(b) and 301(3). The code defines a security interest as an interest in personal property or fixtures which secures payment or performance of an obligation. Section 6A-1-201(37). A security interest in the retainage would be perfected by the filing of a financing statement in the office of the Secretary of State unless the transaction is within one of several exceptions found in §6A-9-302(1).

National offers a twofold excuse for its failure to file the assignment with the Secretary of State. First, it espouses the view expressed by the trial justice when he ruled that the July 3, 1968 assignment had been accepted, at least partially in satisfaction of National's claim against Elhatton, and thus was an absolute assignment rather than a security interest. Alternatively, National argues, as it did in the trial court, that there was no necessity of filing a financing statement because of the exclusionary provisions of §6A-9-302(1)(e).

Initially, we must point out that though the trial justice reached the right result, his reasoning was wrong. *Lancia* v. *Grossman's of R. I., Inc.*, 100 R. I. 407, 216 A.2d 517 (1966).

The trial court, in ruling that the July, 1968 document

---

[2]The judgment entered in the Superior Court awards National the sum of $9,850. This appears to be an erroneous mathematical computation. It can be corrected upon remand. Super. R. Civ. P. 60(a).

constituted an absolute assignment rather than a secured transaction, relied on the holding made in *Spurlin* v. *Sloan*, 368 S.W.2d 314 (Ky.Ct.App. 1963). There, the Kentucky Court of Appeals said that an unrecorded assignment of moneys then due and owing to a road builder on a completed contract had a priority over the lien of an attachment creditor. The Kentucky court, in observing that the assignment concerned an "account" rather than a "contract right," then declared that the code did not apply because the assignment was given as payment for a past-due obligation and not as a security transaction. We believe that *Spurlin* is inapposite to the case at bar.

Within the past two years, it was demonstrated that §6A-9-106 differentiates an "account" from a "contract right" in that an "account" is a right to payment that has been earned by performance while a "contract right" is a right to payment to be earned in the future. *Matthews* v. *Arctic Tire, Inc.*, 106 R. I. 691, 262 A.2d 831 (1970). Once the right to payment has been earned, the contract right is extinguished and an account arises. While the distinction between an account and a contract right might have little significance,[3] both are separate and distinct categories of property, each of which may serve as collateral in a secured transaction. Section 6A-9-102(1)(a).

Although the assignment was made on July 3, 1968, Elhatton's right to the money in the retainage had not been earned. Accordingly, the assignment, unlike the one in *Spurlin*, transferred a "contract right" and not an "account"

---

[3]The final report of the permanent editorial board for the Uniform Commercial Code filed on April 25, 1971, recommends that the term "contract right" be eliminated as being unnecessary. One of the reasons for the recommended change has been the litigation that has been engendered because of inadequate descriptions contained in financing statements. Such statements have listed the collateral as being "accounts" or "general intangibles" when before performance, they should have been described as "contract rights."

to National. Even though we discount the trial justice's reliance on *Spurlin*, our basic disagreement rests upon his belief that the July, 1968 agreement did not create a security interest in the retainage. To the contrary, we are convinced that it did.

Article 9 of the code is applicable to any transaction intended to create a security interest in personal property. Section 6A-9-102(1)(a). In seeking to effectuate the code's provisions, we shall look to the substance rather than the form of the transaction to determine whether or not a transaction is a security agreement. The entire thrust of art. 9 is the protection of the innocent creditors from a secret transfer of substantial intangible assets upon which they relied. Willier & Hart, *U.C.C. Reporter-Digest*, §9-106, A 3 at 2-1613 (1971). The spirit of the code requires a litigant, such as National, to bear the burden of proving that its transaction does not come within the provisions of the code. Or if it relies upon some statutory exception to the code, it must show that the transaction comes within the exception. *Citizens National Bank* v. *Chick Norton Buick Co.*, 8 U.C.C. Reporting Service 1389 (Okla.Ct.App. Div. 1, 1971).

Here, National's action or inaction speaks louder than its words. We think it clear that the assignment was designed to secure payment of not only the money due National for supplies furnished at the graduate center but that the retainage might serve as a source to reduce the indebtedness due for equipment delivered to jobs other than at Brown. In seeking to ascertain the true intent of the parties, it is significant, we believe, that National failed to produce any records which would show that once the assignment had been made, it had reduced the balance due from Elhatton by the amount being retained by Turgeon. This failure, in our opinion, shows that National regarded the retainage as security and not payment. The

trial justice found that at the time the assignment was made, Elhatton was insolvent. National was aware of its customer's fiscal plight. No one could foretell with certainty if Elhatton could finish the Brown University job. If it failed to fulfill its obligation, Turgeon would use the retainage to complete the project. It is apparent that National was hoping Elhatton could weather another financial crisis but it was not sure just how much, if any, of the retainage would find its way into the supplier's coffers. National was looking at the retainage as collateral to be used not only for the Brown University job but also for one or more of the other outstanding plumbing contracts then held by Elhatton. National has failed to persuade us that the assignment was given in payment of a past-due obligation. Rather, we believe the July, 1968 document created a security interest which would secure payment of the money due it from Elhatton.

National, apparently realizing that its assignment might not fall within the ambit of *Spurlin*, argues that its claim should prevail over that of the receiver because of the exclusionary provisions of §6A-9-302(1)(e). This section obviates the necessity of filing a financing statement if the assignment of accounts or contract rights does "* * * not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor."

In his treatise, *Secured Interests in Personal Property* §19.6 (1965), Gilmore tells us that this exemption refers to the casual or isolated assignment. It is not applicable to the assignee who is engaged in the regular business of financing. This distinguished scholar places the exemption in its proper perspective when he explains that §6A-9-302(1)(e) protects the assignee who has no reason to believe that the assignment when made could result in the

transfer to him of a significant part of the assignor's receivables.

Gilmore describes the exemption as a defense in litigation or bankruptcy proceedings rather than a guide for prospective action. He concludes his consideration of this phase of the code by observing that the exemption can serve a beneficent purpose by protecting the "insignificant and ignorant assignee."

National fits that description. It is not in the business of obtaining assignments. The July 3, 1968 episode was an isolated event. Once the S.B.A.'s security interest in the retainage was satisfied, approximately $10,000 was available to National.[4] Such an amount, in our opinion, bearing in mind the purpose of §6A-9-302(1)(e), does not constitute a significant part of Elhatton's receivables.

The receiver's appeal is denied and dismissed.

*Kenneth M. Beaver,* for Elhatton Plumbing & Heating Company, Inc., appellant.

*Jackvony & DeConti, Merlyn A. DeConti,* for National Plumbing & Heating Supply Corp., appellee.

---

[4]From this amount were deducted court costs.