ROGER FRANKEL, TRUSTEE IN BANKRUPTCY OF PRINCE GEORGE'S TRUCK CENTER, INC. *v.* ASSOCIATES FINANCIAL SERVICES COMPANY, INC.

[Misc. No. 4, September Term, 1977.]

*Decided October 6, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Roger Frankel* for appellant.

*W. Michel Pierson,* with whom were *Edward Pierson* and *Pierson & Pierson* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This case, which reaches us under a certification of questions of law by the United States District Court for the District of Maryland, poses two questions, which we shall edit minimally in the interest of clarity: [1]

---

[1]. See Uniform Certification of Questions of Law Act, Maryland Code (1974) §§ 12-601-609 of the Courts and Judical Proceedings Article.

1. Did the security interest created by the Wholesale Security Agreement (the Agreement) dated 10 June 1970 between Prince George's Truck Center (the Truck Center) and Associates Financial Services Company, Inc. (Financial Services) attach to that property repossessed by Financial Services on 18 February 1975, which property was acquired by the Truck Center after the Agreement was executed?

2. Where financing statements were properly filed in the local circuit court prior to the 1971 amendment to Maryland Code (1957, 1964 Repl. Vol.) Art. 95B, § 9-401 [2] changing the requirements regarding place of filing, did the filing of a superfluous subsequent financing statement or a modification statement in the local circuit court in November, 1973, rather than with the State Department of Assessments and Taxation adversely affect any prior perfection of the security interest?

For reasons to be stated, we propose to answer the first question in the affirmative, and the second, in the negative.

## The Facts

On 10 June 1970, the Truck Center entered into an Agreement with Financial Services under which Financial Services was granted "a security interest and security title under the Uniform Commercial Code in all of [its] collateral and in all proceeds thereof whether or not identifiable, and the value thereof (hereinafter collectively called 'proceeds'), to secure the payment of all Floor Plan Advances" which Financial Services might make to the Truck Center.

A Financing Statement was recorded on 12 June 1970 in the office of the clerk of the Circuit Court for Prince George's County, specifying that the Statement covered "new and used motor vehicles, chattel paper" and "all proceeds of the property . . . including but not limited to

---

2. Now Code (1975) § 9-401 of the Commercial Law Article. Throughout this opinion, citations are to the 1975 Code, in which the section numbers and text are identical.

proceeds of sale of all motor vehicles covered by this statement, including money, accounts receivable, chattel paper and motor vehicles received in trade." Thereafter, on 14 January 1971 and on 12 November 1973, substantially similar Financing Statements were filed in the office of the clerk of the circuit court.

On 17 June 1975, the Truck Center was adjudicated a bankrupt by the United States District Court for the District of Maryland. On 18 February 1975, the Truck Center had turned over to Financial Services 19 trucks, purchased in 1974 with funds advanced by Financial Services, which had not been repaid prior to 18 February 1975.

Roger Frankel, trustee in bankruptcy of the Truck Center, sought to recover the trucks on the theory that this transfer was a voidable preference under § 60 of the Bankruptcy Act, 11 U.S.C. § 96 (1964). Financial Services sought a summary judgment on the ground that it had a perfected security interest in each of the trucks which had existed for more than four months prior to the date of the bankruptcy.

The trustee posits his argument on two contentions: first, that the Agreement gave Financial Services no security interest in trucks acquired after the date of the Agreement; and second, that because what is now Code (1975) § 9-401 of the Commercial Law Article had been amended effective 1 July 1971 so as to require filing of certain financing statements with the State Department of Assessments and Taxation, what the trustee regards as the improper filing of the 12 November 1973 Financing Statement invalidated the filings made prior to 1 July 1971.

### The Law

We are quite satisfied that Financial Services has the better of both arguments. Code (1975) § 9-204 (3) of the Commercial Law Article recognizes the validity of a "floating lien," *i.e.*, that the parties may agree that "collateral, whenever acquired, shall secure all obligations covered by the security agreement." While the Agreement in this case may not have been artfully prepared, it must be read in the light of the trade customs followed in floor

planning — the notion that the lien will extend to the dealer's inventory as it may be constituted from time to time. Indeed, this is precisely what § 9-204 (3) contemplates.[3]

While *In re Middle Atlantic Stud Welding Co.*, 503 F. 2d 1133 (3d Cir. 1974) supports the trustee's position, we regard *In re Fibre Glass Boat Corp.*, 324 F. Supp. 1054 (S.D. Fla.), *aff'd*, 448 F. 2d 781 (5th Cir. 1971); *In re Nickerson & Nickerson, Inc.*, 329 F. Supp. 93 (D. Neb.), *aff'd*, 452 F. 2d 56 (8th Cir. 1971); *In re Page*, 16 U.C.C. Rep. Ser. 501 (Paskay, J., M.D. Fla. 1974), and *Biggins v. Southwest Bank*, 490 F. 2d 1304 (9th Cir. 1973), as the better reasoned and propose to follow them. We reject the notion that the security agreement must specifically contain the talisman of "after-acquired property," or its equivalent, however phrased, and prefer instead to interpret the Agreement in the light of trade custom and commercial purpose. It seems to us that when the Agreement, as it did here, defined "collateral" as "new and used trucks," "to be purchased for inventory" and assigned as security the "collateral" and "all proceeds thereof," a continuing relation was contemplated, in which the lender's lien extended to the collateral, as it might exist from time to time, until the indebtedness was satisfied.

This is exactly what § 9-204 intended. We quote Paragraph 3 of the Official Comment to the section:

"3. This Title accepts the principle of a 'continuing general lien' which is stated in Section 45 of the New York Personal Property Law and

---

**3.** The term "floating lien" is nowhere defined in the Uniform Commercial Code. (See, however, Comment 3 to Code (1975) § 9-204 of the Commercial Law Article.) A merchant's inventory is normally in a state of constant flux, as new goods are purchased to replace those sold.

"In other words, the *res* which is the subject of the lien . . . is the merchandise or stock in trade, conceived of as a unit presently and continuously in existence — a 'floating mass', the component elements of which may be constantly changing without affecting the identify of the *res*." Manchester National Bank v. Roche, 186 F. 2d 827, 831 (1st Cir. 1951).

other similar statutes applicable to 'factor's lien'. It rejects the doctrine — of which the judicial attitude toward after-acquired property interests was one expression — that there is reason to invalidate as a matter of law what has been variously called the floating charge, the free-handed mortgage and the lien on a shifting stock. This Title validates a security interest in the debtor's existing and future assets, even though (see Section 9-205) the debtor has liberty to use or dispose of collateral without being required to account for proceeds or substitute new collateral. (See further, however, Section 9-306 on Proceeds and Comment thereto.)

"The widespread nineteenth century prejudice against the floating charge was based on a feeling, often inarticulate in the opinions, that a commercial borrower should not be allowed to encumber all his assets present and future, and that for the protection not only of the borrower but of his other creditors a cushion of free assets should be preserved. That inarticulate premise has much to recommend it. This Title decisively rejects it not on the ground that it was wrong in policy but on the ground that it has not been effective. In the past fifty years there has been a multiplication of security devices designed to avoid the policy: field warehousing, trust receipts, 'factor's lien' acts and so on. The cushion of free assets has not been preserved. In almost every state it is now possible for the borrower to give a lien on everything he has or will have. There have no doubt been sufficient economic reasons for the change. This Title, in expressly validating the floating charge, merely recognizes an existing state of things. The substantive rules of law set forth in the balance of the Title are designed to achieve the protection of the debtor and the equitable resolution of the conflicting claims of creditors which the old rules no longer give."

We turn now to the second certified question. On 12 June 1970, when Truck Center's first Financing Statement was filed, and on 14 January 1971, when the second Financing Statement was filed, the then existing law, Code Art. 95, § 9-401 required that they be filed with the Clerk of the Circuit Court for Prince George's County, a requirement which was met. Effective 1 July 1971, § 9-401 was amended to require that certain financing statements be filed with the State Department of Assessments and Taxation. However, § 9-401 (1) (d) preserved the effectiveness of statements filed prior to the change in the law. The Financing Statement filed with the court clerk on 12 November 1973 was not a modification of the earlier Statements. It was simply an ineffective one. The validity of the earlier Statements was preserved, notwithstanding the transitional provisions of the statute, § 9-401.1, and they remained fully effective.

> *Questions of law answered as herein set forth; costs to be equally divided between the parties.*