AMERICAN EMPLOYERS
INSURANCE COMPANY,
Appellant

v.

AMERICAN SECURITY BANK, N.A.

AMERICAN SECURITY BANK,
N.A., Appellant

v.

AMERICAN EMPLOYERS
INSURANCE COMPANY.

Nos. 83–1457, 83–1496.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 8, 1984.
Decided Nov. 6, 1984.

*Comment on Courts and Lawmaking,* in Legal Institutions Today and Tomorrow 48, 56 (M. Paul- sen ed. 1959).

Edgar T. Bellinger, Washington, D.C., with whom David R. Rivero was on the brief, for American Employers Ins. Co., appellant in No. 83–1457 and cross-appellee in No. 83–1496.

Ann L. Rasenberger, Washington, D.C., also entered an appearance for American Employers Ins. Co.

Richard H. Nicolaides, Washington, D.C., with whom Thomas M. Hennessey and John F. Sherlock, III, Washington, D.C., were on the brief, for American Sec. Bank, N.A., appellee in No. 83–1457 and cross-appellant in No. 83–1496.

Before WALD, BORK, and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

This case involves the interpretation of a trust agreement between American Employers Insurance Company, as surety for the Head Construction Company, and American Security Bank, N.A. District Judge Green entered judgment in favor of the Bank, but denied the Bank's request for attorneys' fees. We affirm.

## I.

While resolution of the legal issues involved in this controversy is relatively uncomplicated, the factual background re-

quires some exposition. Through the early seventies, the Head Construction Company maintained a banking relationship with American Security Bank to finance Head's construction business. As of December, 1974, Head was obligated to the Bank on two unsecured notes totalling $250,000. These notes were due at the end of the month. On December 12, 1974, by letter, Head sought to renew those notes and to borrow an additional $250,000 to finance two recently-awarded construction projects. These projects were labeled F–2b and D–12. In its letter, Head informed the Bank that it had been awarded the contracts and proposed repayment of the new loan "from present accounts receivable ... and/or income from the new contracts." Pl.Exh. ASB–3. Cash flow projections submitted in connection with the loan request listed proceeds from the D–12 contract as an anticipated account receivable, beginning in March, 1975. Pl.Exh. ASB–5.

In early February, Head told the Bank that it would probably need yet another $250,000, raising the total loan amount requested to $750,000. Pl.Exh. ASB–10. The Bank denied the informal request and, although a security agreement and financing statement showing a $750,000 loan were prepared, the documents were never executed. Instead, on February 20, 1975, Head signed a promissory note for $500,-000 payable to the Bank. *See* Record Excerpts of American Security Bank ("R.E. (ASB)") at 1–4. The note extended $250,-000 in new loan monies and refinanced Head's existing obligations. As collateral on the new loan, Head assigned, among other things, all its accounts receivable to the Bank. R.E. (ASB) at 5. Both the financing statement and the security agreement for the new loan listed the collateral as "[a]ll accounts receivable ...." R.E. (ASB) at 5, 6. The financing statement was promptly, but erroneously, filed in the

District of Columbia instead of Prince George's County, Maryland, Head's principal place of business.

Head's financial condition soon deteriorated further. On March 12, the company signed a letter of default asking its surety—American Employers Insurance Company ("American Employers")—to assume its obligations on several bonded contracts. After examining the company's books, American Employers realized that its efforts to keep Head solvent might be frustrated if the Bank demanded immediate payment of the $500,000 note and then set off the debt against Head's payroll accounts at the Bank. With that concern in mind, American Employers representatives met with the Bank on March 17 and again on March 19 to discuss Head's financial difficulties.[1]

During the course of those meetings, it was decided that American Employers, as surety, would continue to finance Head's construction projects rather than allow the company to default on its obligations. To accomplish this, a financial arrangement—set out here in highly simplified terms—was proposed. A "two-tiered" account would be established at the Bank. The first account—opened in Head's name—would be used as a standard checking account from which bills would be paid as they became due. To protect this operating account from the risk of attachment, the account would be maintained at a zero balance. A second, "trust" account—under the control of American Employers—would be created and used to fund the operating account. Thus, as checks written off the zero-balance account would come into the Bank, the Bank would honor them by transferring funds from the trust account. Because the trust account would not be in Head's name, it would not be subject to an attachment of Head's assets.

---

**1.** On a handwritten note labeled "To Be Done 3–17–75," Robert Monaghan, then an American Employers attorney, listed several items to be accomplished in connection with Head's financial condition and these meetings. Among them was a notation to inquire into "what if any assurances can we get from Bk. not to demand immediate payment of notes." Also noted was the need to obtain "copies of Bank loan agreements." R.E. (ASB) at 7. *See also* Transcript at 597 (testimony of Mr. Monaghan).

The Bank was chosen for this arrangement because it was already Head's bank. Mr. Head had told the surety that in the construction industry, if a contractor changes banks, it is interpreted as a sign of financial troubles. American Employers did not want to harm Head's image in the community. *See* Transcript ("Tr.") at 327, 624. Using the Bank raised a potential problem, however. Under common law, where the depository bank is owed money by the contractor, the bank has the right to set off its indebtedness against the two-tiered account. The solution was the creation of a trust agreement in which American Security Bank agreed not to set off against any of the funds deposited in the account in exchange for American Employer's recognition of the Bank's security interest in Head's accounts receivable.

The precise details of the meetings are in dispute. Witnesses for the Bank testified that the American Employers representatives were specifically informed of Head's assignment to the Bank and the contents of the financing statement filed in connection with the assignment. Tr. at 111–12 (testimony of Gerald P. LeNoir, vice president and commercial loan officer in 1975); 175–77 (testimony of Saul Schwartzbach, an attorney representing the Bank during negotiations of the trust agreement). The Bank's witnesses testified that the American Employers representatives asked for and received access to the Bank's files relating to Head, including the promissory note, security agreement, and financing statement, and were allowed to take copies of any documents of which they did not already have copies.

Testimony about the meetings from American Employers, on the other hand, was far less specific. While each witness testified to having knowledge of Head's sizeable indebtedness to the Bank, *e.g.*, Tr. at 635 (testimony of James Dolan, attorney for American Employers), all denied, or failed to recall, having seen or having

knowledge of the contents of the security agreement or financing statement at that time. Mr. Monaghan testified that he "assumed [the Bank] had protected all their [sic] rights by filing Uniform Commercial Code filings." Tr. at 504. He also stated that he assumed the Bank had taken a security interest in Head's accounts receivable because that was the "normal course of business." Tr. at 598. He did not recall seeing any financial documents or exchanging any documents at the meetings. Tr. at 505, 597–98. William Callahan, a claims adjustor for American Employers' parent company, also testified that he did not recall any specific discussion about Head's indebtedness aside from the Bank's demand for payment. Tr. at 371, 374–75. Finally, James Dolan testified only that he knew Head had assigned "something" to the Bank, but he did not know "how far the assignment went." Tr. at 648–49.

After the March 19 meeting, American Security Bank agreed in principle to the proposed arrangement and the creation of the trust agreement. American Employers agreed to recognize the Bank's security interest in Head's accounts receivable, and the Bank agreed not to set off Head's indebtedness against the "two-tiered" account.[2] Specifically, the agreement called for the creation of a "special trust checking account" in the names of three American Employers representatives. Receipts from certain listed contracts, the D–12 and F–2b projects among them, were to be deposited in that account and could be withdrawn only to satisfy specific obligations relating to those contracts, including the payment of the "debit balance in the separate account with the bank" (the "zero-balance" operating account). American Employers was further obligated under the agreement to maintain records of all withdrawals, specifying the use to which each was put, and to submit to the Bank semi-annual accountings "for each separate Head contract"

---

**2.** The Bank realized that it stood a greater chance of substantial recovery of its loan if Head was kept in business, since liquidation at that time would not provide a very good yield.

Tr. at 42–44 (testimony of John Sumter, executive vice-president and senior lending officer of the Bank during the period in question); 106, 111 (testimony of Gerald P. LeNoir).

showing all authorized deposits and withdrawals. The D–12 contract was among the contracts subject to the agreement's strict record-keeping requirements. Finally, the agreement sought to protect and clarify the Bank's status as a creditor of Head. The initial draft of the agreement provided as follows:

> To the extent funds received under a specific contract and paid into the account exceed expenditures under that contract, ... the surplus under that specific contract, as shown by the accounting, shall be, as between the parties hereto, subject to any now-existing priority created by Head's assignment of receivables to the Bank.

R.E. (ASB) at 11. Thus surplus funds from specified contracts would first be subject.to the Bank's priority, if any, in Head's accounts receivable at the time the agreement was executed.

Anticipating the consummation of the agreement, the Bank extended the due date on Head's $500,000 note after the March 19 meeting. The Bank did not know, however, that on March 20 American Employers had Head assign all of its assets, including all of its accounts receivable, present and future, and all contract rights to American Employers. A financing statement perfecting this assignment was properly filed March 27, 1975.

The parties reviewed the initial draft of the trust agreement on March 21. American Employers executed a copy of the agreement and sent it to the Bank. On March 28, the Bank returned an executed copy of the agreement, with two changes,[3] to American Employers, and asked American Employers to initial the changes and return a fully executed agreement to the Bank. Tr. at 49–50. The original trust agreement executed by American Employ-

ers only was never located. Brief for Appellee at 8 n. 4.

The trust agreement continued in force for six years, but the course of dealings between the parties to it was not harmonious. The Bank repeatedly requested the complete written accountings required by the trust agreement, to no avail.[4] On February 18, 1981, the Bank made a formal claim to American Employers for payment of $485,258.37, plus interest, pursuant to its promissory note and trust agreement. Pl.Exh. ASB–50. American Employers made one payment, three months later, of $55,099.19. Pl.Exh. ASB–54. Finally, on July 31, 1981, the Bank filed suit against American Employers to recover the remaining balance on the promissory note, plus interest, court costs, and attorneys' fees.

The district court held for the Bank, entering judgment for $430,159.18, plus interest and costs. The district court denied the Bank's claim for attorneys' fees. American Employers appealed the judgment against it (No. 83–1457), and the Bank appealed the denial of attorneys' fees (No. 83–1496).

There are five issues on appeal: whether the Bank is collaterally estopped from claiming priority over American Employers by virtue of the decision in *American Security Bank v. United States*, 607 F.2d 493 (D.C.Cir.1979) (affirming the district court's unpublished decision) [hereinafter cited as "*ASB*"]; whether the district court found that American Employers had "actual knowledge" of the Bank's misfiled financing statement sufficient to perfect the Bank's security interest as against American Employers, as provided in Maryland Commercial Code §§ 9–401(2) and 1–201(25) (1975); whether the Bank's security interest included the receipts from the D–12 project; whether the district court erred by not allowing the entire record of

---

3. In the paragraph of the agreement quoted in the text, the Bank attorney suggested that "any now-existing priority" be changed to "the now-existing priority" to reflect that the Bank had an existing priority. Tr. at 216–17. The second change clarified that only one person was necessary to sign checks drawn on the trust account,

instead of all three of the people empowered to sign those checks, and is not related to the present controversy. *See* R.E. (ASB) at 9.

4. *American Security Bank v. American Employers Insurance Co.*, No. 81–1800, mem. op. at 9 (D.D.C. Mar. 30, 1983).

the previous case, *ASB*, into evidence; and whether the district court correctly denied attorneys' fees to the Bank. We address these issues in order.

## II.

■ Collateral estoppel, or issue preclusion, prevents a party from relitigating an issue "actually and necessarily decided in the prior suit." *I.A.M. National Pension Fund v. Industrial Gear Manufacturing Co.*, 723 F.2d 944, 949 (D.C.Cir. 1983). American Employers argues that the priority dispute was determined in *ASB*. In that case, four claimants asserted priority in a $200,000 certificate of deposit ("C.D.") owned by Head and held in escrow by the Bank. The Bank claimed perfection of a security interest in the C.D. by virtue of possession and the misfiled financing statement; American Employers claimed priority arising from its March 27, 1975 financing statement. The district court in that case held that the Bank "stands as last claimant in line" because its financing statement was not filed in the proper place. The Bank tried to claim that Head's February 20, 1975 assignment to it included the C.D. The district court held that the assignment did not refer to the C.D. *American Security Bank v. United States*, No. 77-0918, mem. op. at 2 (D.D.C. June 28, 1978). Therefore, actual knowledge by American Employers of the misfiled financing statement would not have affected the outcome of the case. The issue of actual knowledge was not "necessary to the decision," nor was it actually litigated in *ASB*.[5] *See National Savings & Trust Co. v. Rosendorf*, 559 F.2d 837 (D.C.Cir.1977) (collateral estoppel does not bar issues that might have been but were not decided, nor those not essential to previous adjudication). American Employers' argument that the Bank is collaterally estopped fails to establish either element of issue preclusion.

## III.

■ Appellant American Employers criticizes the district court's findings as broad and conclusory and as failing to articulate the applicable legal standard. American Employers suggests that remand is necessary to develop more specific findings of fact and to be sure the appropriate legal standard was applied. This contention is made particularly with respect to the issue of priority as between the Bank and American Employers. There is, however, no need for remand if an intelligent review of the record can be made. *Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527, 540 (D.C.Cir.1975), *rev'd on other grounds*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). Such a review is certainly possible in this case.

■ Appellant argues that Judge Green did not apply the correct legal standard. We think she did. Uniform Commercial Code ("U.C.C.") § 9–401(2) provides that a misfiled financing statement is effective against parties who have knowledge of it. Knowledge is defined in U.C.C. § 1–201(25) as actual knowledge.[6] There is a range of authority as to the minimum level of knowledge short of reading the document that will satisfy the actual knowledge standard. *See, e.g., United States v. Ed Lusk Construction Co.*, 504 F.2d 328 (10th Cir. 1974) (per curiam) ("knowledge means actual knowledge or reason to have such actual knowledge, not constructive knowledge in any broader sense"); *Franklin National Investment Corp. v. American Swiss Parts Co.*, 42 Mich.App. 211, 201 N.W.2d 673 (1972) (where one creditor told another creditor that collateral in question was being financed; held, sufficient to give "knowledge of the contents of any financing statement filed by [the financier]"). The district court referred to this line of cases.

It is abundantly clear, moreover, that Judge Green found not only that American

---

5. *ASB* was decided on cross motions for summary judgment. *American Security Bank v. United States*, No. 77-0918, mem. op. at 2 (D.D.C. June 28, 1978).

6. There is no dispute that Maryland law applies in this situation. Moreover, the Maryland and D.C. Commercial Codes are essentially identical to the U.C.C. on these points.

Employers' representatives had "actual knowledge" of the contents of the misfiled financing statement but had in fact read it. The issue of actual notice was sharply controverted at trial. The Bank's representatives stated that American Employers received copies of the misfiled financing statements on March 19. *See* Tr. at 112 (testimony of Gerald P. LeNoir); 175–77 (testimony of Saul Schwartzbach). American Employers' witnesses denied knowledge of the misfiled financing statement on or before March 19, 1975. *See* Tr. at 326 (testimony of William Callahan); 505, 597–98, 626 (testimony of Robert Monaghan). Judge Green stated in her opinion "the Court finds credible the testimony of the Bank representatives that AEI representatives had knowledge of the existence of the Bank's financing statement and its contents by March 19, 1975." Mem. op. at 6–7. The district court went further, however, and found that American Employers' representatives had seen the document in question. This is plain from the judge's discussion of another case.

> The Oklahoma Supreme Court in *Security National Bank v. Dentsply Professional Plan,* 617 P.2d 1340, 1344–45 (Okla.1980), cited by [American Employers], suggested that § 9–401(2) in Oklahoma required "more than mere knowledge of the prior security interest but less than … actually hav(ing) seen the improperly filed financing statement." That dictum does not aid AEI because the Bank here passed even the strictest test proposed by the Oklahoma court.

Mem. op. at 15. To pass the "strictest test" the Bank had to have satisfied the judge that American Employers' representatives had seen the document. This is hardly surprising, for, in addition to relying upon her assessment of the evidence and the "witnesses' candor," the trial judge found, quite correctly, that "competent attorneys," such as those representing appellant, "would have learned from Mr. Head of his assignment of accounts receivable to the Bank and the Bank's subsequent financing statement," and that "it defies common sense to suppose the Bank representatives, in attempting to get AEI to pay Head's $500,000 debt, would have failed to disclose at the meetings Head's assignment of accounts receivable and the Bank's financing statement covering that interest." Mem. op. at 6.

These findings settle the matter. American Employers had the requisite knowledge of the financing statement and the Bank's priority is thus established.

### IV.

American Employers contends that the Bank's financing statement did not include the proceeds from the D–12 and F–2b projects. At the time the security agreement was executed between Head and the Bank, the contracts for the projects had just been granted to Head, and they were indisputably contract rights. When the trust agreement was executed, the projects were barely begun. The D–12 project had been completed with a surplus in 1978, well before the time that the dispute between the Bank and American Employers matured. Under the Maryland version of U.C.C. § 9–106 in effect at the time the security agreement between the Bank and Head was executed, a contract right was extinguished upon performance and became an account receivable.[7] *See Eyde Construction Co. v. Public Data Associates,* 6 B.R. 733 (W.D.Mich.1980); *E. Turgeon Construction Co. v. Elhatton Plumbing & Heating Co.,* 110 R.I. 303, 307, 292 A.2d 230, 233 (1972) ("Once the right to payment has been earned, the con-

---

7. The 1962 version of the Uniform Commercial Code defines a contract right as "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper," and an account as "any right to payment for goods sold or leased or for services rendered which it not evidenced by an instrument or chattel paper." In 1972, the Uniform Commercial Code was amended, eliminating the contract rights definition and merging the former categories of contract rights and accounts into the definition of accounts: "any right to payment for goods sold or leased or for services rendered … whether or not it has been earned by performance." Maryland did not adopt this change until 1980.

tract right is extinguished and an account arises."). Therefore, at the time of the dispute, the collateral at issue constituted accounts receivable. Both American Employers and the Bank held security agreements granting each a security interest in Head's accounts receivable. R.E. (ASB) at 5 (Bank's security agreement); Def.Exh. 14 (American Employers' security agreement). Because of our holding as to American Employers' actual knowledge of the misfiled financing statement, *supra* Part III, American Employers' priority in the collateral covered by the Bank's misfiled financing statement is inferior to that of the Bank. The question remains whether the proceeds from the two projects were covered by the Bank's financing statement and security agreement.

The Bank's financing statement stated that it covered "all accounts" of Head. American Employers contends that this description is not sufficient to cover the disputed collateral because that consisted of contract rights at the time the financing statement was filed. American Employers contends, correctly, that Head's rights in the project were contract rights at the time of the filing and had become accounts receivable (after-acquired accounts receivable as to the Bank) by the time the priority dispute arose. American Employers claims further that the financing statement must describe the collateral as "contract rights" or "after-acquired accounts receivable" in order to include it within the Bank's security interest. *See* Brief for Appellant at 11. This proposition is incorrect.

The determination whether the after-acquired accounts are included in the Bank's collateral requires us to interpret the security agreement to determine the intent of the parties to the security agreement, Head and the Bank. There are two issues in this determination: whether the security agreement can be read *objectively* to include after-acquired collateral, and whether the parties to the agreement intended to include after-acquired property in their agreement. *See* J. White & R. Summers, *Handbook of the Law of the Uniform Commercial Code* 912 (2d ed. 1980).

Accounts receivable and inventory are not like the other classes of collateral. These types of collateral are constantly turning over, and are usually conceived of as a single entity. *See Manchester National Bank v. Roche*, 186 F.2d 827 (1st Cir.1951); · *Rosenberg v. Rudnick*, 262 F.Supp. 635 (D.Mass.1967); *In re Platt*, 257 F.Supp. 478 (E.D.Pa.1966). The financing statement need not say "future" or "after-acquired" in order to include after-acquired collateral of the same type as described in it. *See Continental Oil Co. v. Citizens Trust & Savings Bank*, 57 Mich. App. 1, 225 N.W.2d 209 (1974), *aff'd*, 397 Mich. 203, 244 N.W.2d 243 (1976); *South County Sand & Gravel Co. v. Bituminous Pavers ·Co.*, 106 R.I. 178, 183, 256 A.2d 514, 517 (1969) ("[T]he description of the collateral as 'accounts receivable' sufficiently identified the collateral as to put a prospective creditor on notice of the probability that the security agreement did embrace present and future accounts receivable. Any other view would ignore the realities of the world of financing."). As the court held in *In re Platt*, construing a financing statement that read, "Inventory and Accounts Receivable":

> The addition of the word "future" to "accounts receivable and inventory" would not seem to help an interested party in determining the status of the debtor. It should be clear that the creditor is concerned with tying up whatever is the current inventory and accounts receivable of the debtor. No reasonable searcher of the records would conclude that the secured party had a lien on only the past accounts and inventory of the debtor . . . .

257 F.Supp. at 481. The purpose of the financing statement is to put the creditor on notice of a potentially superior security interest so that he can consult the security agreement and possibly the filing creditor to determine whether the collateral is indeed included. A description of "all accounts" is sufficient to put a creditor on notice that after-acquired accounts receiva-

ble might be included in the security agreement.

It is reasonable to read a security agreement granting an interest in all inventory or receivables to include after-acquired inventory or receivables. *Frankel v. Associates Financial Services Co.*, 281 Md. 172, 176, 377 A.2d 1166, 1168 (1977) ("We reject the notion that the security agreement must specifically contain the talisman of 'after-acquired property' or its equivalent."); *In re Nickerson & Nickerson, Inc.*, 329 F.Supp. 93, 96 (D.Neb.), *aff'd*, 452 F.2d 56 (8th Cir.1971) (neither security agreement nor financing statement stated inclusion of after-acquired inventory, both referred to "all inventory"; held, after-acquired inventory "automatically covered" by the agreement unless otherwise stated); *In re Fibre Glass Boat Corp.*, 324 F.Supp. 1054, 1056 (S.D.Fla.), *aff'd*, 448 F.2d 781 (5th Cir.1971); *In re Middle Atlantic Stud Welding Co.*, 503 F.2d 1133, 1137 (3d Cir. 1974) (dissent of Chief Judge Seitz) ("it would ... be commercially reasonable to anticipate that security interests in inventory or accounts would include after-acquired property, even though the presumption would be reversed for other property"). *But see id.* at 1136 (majority opinion) (requiring intent to include after-acquired accounts to be "unambiguously expressed" in the security agreement). Therefore, the objective aspect of our determination is satisfied.

The Bank produced evidence at trial demonstrating Head's intent to include the receipts from the two projects in the security agreement. Head wrote a letter to the Bank, requesting additional financing, on December 12, 1974. Pl.Exh. ASB–3. The letter stated that the new loan would be repaid with receipts from the new contracts. *Id.* In addition, Head provided the Bank with a cash-flow statement, which noted "Receipts—Contracts" from the F–2b and D–12 projects beginning in February and March, 1975, respectively. Pl. Exh. ASB–10. Clearly, Head and the Bank intended to include the receipts from these projects in the collateral. Therefore, the subjective aspect of our interpretation of the security agreement is also satisfied.

The trust agreement demonstrates that American Employers had knowledge of Head's intent to grant an interest in after-acquired accounts to the Bank. Paragraph 3 of the agreement states that "[f]uture payments of monies due or to become due ... are to be deposited in the ... trust account." R.E. (ASB) at 10. The surplus from the contracts covered by the trust agreement was to be paid to the Bank "to the extent the Bank is entitled to such surplus" because of Head's assignment to the Bank. R.E. (ASB) at 11. The trust agreement agreed to freeze "the [any] now-existing priority"[8] of the Bank. Witnesses for American Employers repeatedly stated that the trust agreement was not intended to affect the Bank's rights in the collateral. Tr. at 383 (testimony of William Callahan); 503 (testimony of Robert Monaghan); 636 (testimony of James Dolan). American Employers concedes that the trust agreement "neither enlarged nor diminished the scope of the Bank's security interest." Brief for Appellant at 25. The Bank's priority, as we have shown, was established prior to the date of the trust agreement.

Because the Bank has established its priority in the F–2b and D–12 project receipts, we must apply the provisions of the trust agreement to determine the Bank's rights as against American Employers. The operation of the agreement is simple: if there is a surplus in a contract included in Schedule A to the agreement, the Bank is entitled to the surplus to the extent of its legal priority in the receivables of that contract. There was a $1.1 million surplus on the D–12 contract. *See* mem. op. at 20; Def.Exh. 21. The Bank has priority over this surplus, as against American Employers. The Bank's assignment from Head is collateral for Head's promissory note to the Bank, which entitles it to the remaining balance of the $500,000

---

**8.** *See supra* note 3.

note, plus interest and costs. R.E. (ASB) at 3. *See* mem. op. at 2.

## V.

■ District Judge June Green denied American Employers' request to admit the entire record of *American Security Bank v. United States,* over which Judge Green had also presided. In its proffer, American Employers claimed that the entire record was necessary to determine the collateral estoppel issue and to evaluate the credibility of one of the Bank's witnesses, Mr. LeNoir. Tr. at 695–96. The latter purpose certainly does not require that the *entire* record be admitted; furthermore, the attorney for American Employers made extensive use of the transcript of Mr. LeNoir's testimony in *ASB* during his cross-examination of Mr. LeNoir at the trial of this case. *See* Tr. at 153–59. American Employers asserts that the entire record was necessary to evaluate the credibility of the other Bank witnesses, even though American Employers did not attempt to use the transcript on cross-examination of the other witnesses, and in spite of the fact that American Employers did not raise this argument at any point in the trial. Since the transcript could have been used, as Mr. LeNoir's cross-examination shows, this contention is without merit. In any event, the point was not preserved for review. The real issue, therefore, is whether the entire record was necessary to determine the applicability of collateral estoppel.

Judge Green's opinion in *ASB* gives the grounds for her decision and makes clear the issues actually decided. As noted previously, the issue that American Employers claims is precluded in this action was not decided in the previous case. Therefore, the entire record was not necessary to determine the collateral estoppel issue. American Employers has not—and in view of our decision cannot—demonstrate any error in or prejudice from the district court's decision.

## VI.

The Bank appeals the district court's denial of attorneys' fees. The Bank admits that the only possible ground for an award of attorneys' fees is the exception to the American rule which allows an award of attorneys' fees when the party has been the victim of unwarranted, oppressive, or vexatious conduct on the part of his opponent and has been forced to sue to enforce a plain legal right. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *Vaughan v. Atkinson,* 369 U.S. 527, 530–31, 82 S.Ct. 997, 999–1000, 8 L.Ed.2d 88 (1962); *Wisconsin Avenue Associates v. 2720 Wisconsin Avenue Cooperative Association,* 385 A.2d 20, 24 (D.C. 1978). The Bank sued for two types of relief: an accounting of the receipts and expenditures associated with the F–2b and D–12 contracts as required by the trust agreement, and a judgment for the remaining balance on the promissory note secured by all Head's accounts receivable.

■ As to the trust agreement, American Employers presented a full accounting on the first day of trial. Def.Exh. 21. *See* Tr. at 3, 191. The Bank was unable to show that American Employers' failure to provide a full accounting prior to trial was unwarranted, oppressive, or vexatious conduct. The accounting provisions of the trust agreement were stringent; American Employers informed the Bank early in the relationship that it was having difficulty meeting the trust agreement's requirements. *See* Pl.Exhs. ASB–32, ASB–33. In addition, American Employers did provide the Bank with four partial accountings, beginning in 1979. Pl.Exhs. ASB–40, ASB–46, ASB–48, ASB–54. The district court found that these constituted "some efforts to provide accounting information," and that American Employers' conduct did not "rise to the level of bad faith or oppressively fraudulent conduct." Mem. op. at 22.

As to the second type of relief requested by the Bank, it certainly was not a plain legal right. The Bank's right to the surpluses was not clear; it required the interpretation of the Bank's financing statement

and security agreement, including resort to parol evidence, and deciding which witnesses to believe on the actual notice issue. Moreover, the law on the issue of inclusion of future accounts receivable by the use of the term "all accounts receivable" was not settled.[9] The Bank could hardly be said to have a plain legal right. *See F.W. Berens Sales Co. v. McKinney,* 310 A.2d 601, 603 (D.C.1973). The Bank has not demonstrated a right to an award of attorneys' fees as to either claim and we will not disturb the district court's exercise of its sound discretion.

*Affirmed.*

9. *See* cases cited *supra* at p. 1501.