**WEST DES MOINES STATE BANK, Plaintiff–Appellee,**

**v.**

**BRUNSWICK CORPORATION, Defendant–Appellant.**

**BRUNSWICK CORPORATION, Counterclaim Plaintiff–Appellant,**

**v.**

**WEST DES MOINES STATE BANK, Counterclaim Defendant–Appellee.**

No. 91–284.

Court of Appeals of Iowa.

Jan. 29, 1992.

Diane M. Stahle and Mark D. Walz of Davis, Hockenberg, Wine, Brown, Koehn & Shors, P.C., Des Moines, for appellant.

Gayla R. Harrison, Richard A. Malm, and Charles F. Becker of Dickinson, Throckmorton, Parker, Mannheimer & Raife, P.C., Des Moines, for appellee.

Heard by SCHLEGEL, P.J., and HAYDEN and SACKETT, JJ.

HAYDEN, Judge.

This case arises from the financial failure and bankruptcy of two related corporations, Des Moines Boating Center, Inc., formerly located in Ankeny, Iowa, and Boatland, Inc., formerly located in Omaha and Lincoln, Nebraska. Both corporations had the same stockholders and officers. Prior to December 1988 both corporations were in the business of retailing boats and motors. For purposes of this appeal the two corporations will be treated as a single entity, hereinafter referred to as DMBC.

Mercury Marine is a division of Brunswick Corporation. DMBC established a relationship with Mercury Marine for the sale of engines and parts produced by Mercury Marine. As part of this relationship, Mercury Marine offered its dealers a rebate

program as an incentive to buy its products and to market those products aggressively. Mercury Marine rebated a portion of the purchase price paid by the dealer and also a portion of the price paid by the ultimate consumer. During 1988 DMBC had accumulated approximately $109,000 in Mercury Marine's rebate program. Those accumulated rebate funds are the focus of the dispute in this case.

Beginning in 1984 DMBC financed the purchase of boat motors through Mercury Marine Acceptance Corporation (MMAC). MMAC took security interests in certain collateral. MMAC is a wholly owned subsidiary of Chrysler First Corporation. It is a separate entity from Mercury Marine.

In 1987 West Des Moines State Bank (West Bank) issued a $1 million line of credit to DMBC in return for a general security interest in all inventory, accounts, general intangibles and equipment of DMBC. In addition, West Bank took a specific assignment of the rebate funds on November 5, 1987.

In November 1988 DMBC notified its creditors it was having financial difficulties. As a result of those difficulties, DMBC was unable to pay its debt to MMAC. On December 13, 1988, MMAC notified DMBC it was accelerating DMBC's debt and sought payment in the amount of $813,998.83. This amount was not paid by DMBC.

On December 14, 1988, Mercury Marine notified DMBC it was terminating DMBC's direct sales contract. On December 15, 1988, DMBC filed for bankruptcy.

In January 1989 MMAC informed Mercury Marine DMBC's accounts were delinquent. MMAC demanded payment from Mercury Marine pursuant to an agreement between Mercury Marine and MMAC. That agreement provided MMAC had full recourse against Mercury Marine for any debt not paid by a financed dealer. On January 16, 1989, Mercury Marine paid MMAC the amount owed by DMBC. On January 19, 1989, MMAC assigned to Mercury Marine all rights MMAC had in the unpaid obligations of DMBC.

Both West Bank and Mercury Marine obtained relief from the bankruptcy court's automatic stay. Both creditors then repossessed and sold certain inventory items to recover some of the debt owed them. In addition, West Bank laid claim to the $109,000 in dealer-incentive rebates based on its security interest.

West Bank filed the present suit against Mercury Marine and its parent corporation, Brunswick, seeking the $109,000 in rebate money held by Mercury Marine. Mercury Marine claimed West Bank was not entitled to the rebate funds because DMBC's direct sales contract was terminated prior to the end of the year; thus, the funds remained profits of Mercury Marine. In addition, Mercury Marine counterclaimed, alleging West Bank had wrongfully repossessed certain DMBC inventory in which Mercury Marine had a prior security interest. Mercury Marine's counterclaim sought damages for conversion.

This action was tried to the court which ruled in favor of West Bank on all issues. The district court found Mercury Marine owed $109,000 in dealer-incentive rebate money to DMBC. In addition, the court determined West Bank's general security interest in DMBC's assets entitled West Bank to the rebate money. The district court also rejected Mercury Marine's counterclaim, holding its security interest did not cover the controverted inventory items.

Mercury Marine appeals from the district court's ruling. Mercury Marine does not dispute DMBC had accumulated rebate funds during 1988. Mercury Marine contends, however, DMBC was not entitled to receive the rebate funds because DMBC was neither a contracted dealer nor in good standing on December 31, 1988. In the alternative, Mercury Marine argues even if it was obligated to pay rebates to DMBC at the end of 1988, it was nonetheless entitled to offset the debt DMBC owed to MMAC and by assignment owed to Mercury Marine. Finally, Mercury Marine contends the district court erred in rejecting its counterclaim against West Bank for conversion arising from West Bank's repossession of DMBC inventory.

I. *Scope of Review.* Our review is for correction of errors at law. Iowa R.App.P. 4. The trial court's findings of fact have the effect of a special verdict and are binding on us if supported by substantial evidence. *Id.;* Iowa R.App.P. 14(f)(1).

■ II. *Rebate Funds.* The rebate program at issue was available to dealers only if they were (1) contracted dealers and (2) in good standing at the end of the calendar year. Mercury Marine claims DMBC was not in good standing at the end of 1988 because its account with MMAC had to be current to qualify as a dealer in good standing. Mercury Marine's claim is not supported by the incentive rebate program agreement. By its terms the incentive rebate program applied only to "contracted dealers in good standing" at the end of the year. No language appears indicating DMBC's account with MMAC had to be current to fulfill the good standing requirement, nor does the testimony of Mercury Marine's own witnesses support its assertion. They testified all terms of the rebate program were contained exclusively in the incentive rebate program agreement. Furthermore, the evidence shows during the previous year DMBC's rebate check was sent from Mercury Marine directly to MMAC presumably to bring DMBC's account with MMAC current. This evidence contradicts Mercury Marine's position that the MMAC account had to be current in order for DMBC to be in good standing.

Mercury Marine additionally claims DMBC was not a contracted dealer at the end of the year because Mercury Marine had terminated DMBC's sales contracts on December 13, 1989. By the terms of the direct sales and service contract, Mercury Marine could, upon notice, immediately terminate the contract for cause based on any one of nine events, or terminate on thirty-days' notice for no cause. Mercury Marine claims it gave notice of immediate termination for cause by a letter dated December 13, 1988. In its letter Mercury Marine stated the reason for termination was DMBC's "failure to maintain a satisfactory payment record with *Mercury Marine.*" The trial court found, however, and we agree, at all times prior to January 16, 1989, DMBC's account with Mercury Marine was current. In addition, failure to maintain a satisfactory payment record with Mercury Marine was not one of the nine events in the direct sales and service contract which would justify immediate termination. Insolvency was, however, listed as an event which would justify immediate termination upon notice. We must therefore determine whether a notice is effective to cancel a contract when, by its terms, it does not conform to the for-cause termination events of the contract.

A similar issue was addressed in *Oldfield v. Chevrolet Motor Co.,* 198 Iowa 20, 199 N.W. 161 (1924). The plaintiff in *Oldfield* possessed an automobile agency contract under which he was entitled to an additional rebate on purchases made by him during the fiscal year ending July 31, provided the contract remained in force on that date and other conditions, not relevant to this appeal, were met. *Id.* at 21, 199 N.W. at 161. The contract allowed either party to terminate the agreement on five days' written notice. *Id.* On July 13 Chevrolet mailed the plaintiff a notice stating termination of Oldfield's dealer contract would terminate within five days from the date of the letter. *Id.* The letter did not reach the plaintiff on the thirteenth so as to provide him with five days' written notice from that date. *Id.* at 23, 199 N.W. at 162. Oldfield brought suit for the additional rebate.

The Iowa Supreme Court held the notice was ineffective to cancel the contract. *Id.* at 24, 99 N.W. at 162. The court required strict adherence to the contract's notice provision to effect a termination. *Id.* at 25, 119 N.W. at 163.

*Oldfield* was limited in *Harrington v. Bremer County Farmers Mutual Fire Insurance Association,* 203 Iowa 282, 211 N.W. 383 (1926). The court in *Harrington* stated

> [i]n [*Oldfield* ], we were construing a contract ... where the effect of the termination ... by notice was to deprive the other party to it of substantial, subsisting rights under it, which only the lapse

of a short time and the continuation of the contract were required to mature. It was there held, under such circumstances, that the party preparing the contract and attempting to terminate it by notice was bound to a strict compliance of the provisions of the contract for its termination.

*Id.* at 284, 211 N.W. at 384. In comparison, the rights of the parties in *Harrington* were future rights. *Id.* Under those circumstances, the court determined strict compliance with the notice provision was not required. *Id.*

In *Shain v. Washington National Insurance Co.*, 308 F.2d 611 (8th Cir.1962), the court was asked to apply *Oldfield.* The court refused to do so because the claim before the court was for payment for services currently rendered, or to be rendered in the future, rather than an accumulation of amounts already earned by past services as was the situation in *Oldfield.* *Id.* at 616.

In the present case, termination of the contract effectively deprived DMBC of its rights in funds already earned by past services, and only the lapse of a short time and continuation of the contract were required to mature. We conclude this case is controlled by *Oldfield.* Therefore, Mercury Marine's notice, which by its terms did not comport with the termination-for-cause events in the contract, was not effective to cancel DMBC's sales contracts.

We also reject Mercury Marine's claim that DMBC had no substantial, subsisting rights in the rebate funds because there was no liability for payment of the funds until February 24, 1989. The attempted termination in *Oldfield* occurred less than two weeks before the dealer would have been entitled to recover the rebate and one and one-half months before it was to be paid. *Oldfield,* 198 Iowa at 21–22, 199 N.W. at 161–62. Nevertheless, the court awarded the rebate to the dealer.

Relying on *C.C. Hauff Hardware Inc. v. Long Manufacturing Co.,* 257 Iowa 1127, 136 N.W.2d 276 (1965), Mercury Marine also asserts there is a distinction between terminations of dealer contracts for cause and terminations without cause upon notice. In *Hauff* it was stated

a contract which contemplates services, expenditures and action other than personal services only, is valid and effective until at least a reasonable notice of cancellation is given, *or* good cause for termination is shown. (Emphasis added.)

*Id.* at 1130, 136 N.W.2d at 278.

Mercury Marine argues the parties contractually agreed to the specific events which would constitute a breach of the contract by DMBC which would give rise to an immediate termination for cause. One of those reasons, insolvency, existed at the time DMBC's contract was terminated. Mercury Marine claims under the holding of *Hauff* it was not required to provide notice because a good cause for termination was present. We disagree. The claimed contract in *Hauff* was oral. Thus, there was no provision requiring notice be given. In the present case, however, the direct sales contract explicitly requires Mercury Marine to provide DMBC with notice of termination even if the termination is for cause.

Based on the evidence presented and existing Iowa case law, we hold the district court correctly determined Mercury Marine was obligated to pay the rebate fund to DMBC.

■ III. *Mercury Marine's Claim of Offset.* In the alternative, Mercury Marine argues even if it was obligated to pay rebates to DMBC, it was entitled to offset amounts owed by DMBC. Mercury Marine claims a right of offset for two reasons.

First, Mercury Marine asserts it had a right to charge back-paid but unearned rebates. This reason was rejected by the trial court which found there was no written charge-back policy prior to April 1990 and no showing the policy was previously applied or communicated to West Bank or DMBC. We agree with the trial court's findings.

■ Second, Mercury Marine claims a right of offset as a result of paying DMBC's debt to MMAC and MMAC's subsequent assignment to Mercury Marine of

all rights it had in the unpaid obligations of DMBC. An assignee takes its interest subject to defenses or claims of the account debtor against the assignor which accrue before the account debtor receives notification of the assignment. *See* Iowa Code § 554.9318 (1991). The assignee's rights can rise no higher than those of its assignor. *First National Bank of Louisville v. Master Auto Service Corp.*, 693 F.2d 308, 314 (4th Cir.1982).

■ In November 1987 DMBC assigned its interest in the rebate funds to West Bank. At that time West Bank had in place a financing statement which included accounts receivable and general intangibles. West Bank gave sufficient notice of the assignment to Mercury Marine. *See* Iowa Code § 554.1201(26)(a) (1991). Mercury Marine had not acquired any right of offset prior to receiving notification. On January 16, 1989, Mercury Marine paid DMBC's debt to MMAC and took an assignment from MMAC of the unpaid obligations of DMBC. DMBC's obligations to Mercury Marine did not create a right of offset until the assignment by MMAC on January 19, 1989. By that time Mercury Marine had notice of West Bank's claim to the rebate funds. If the secured party gives notice of its interest prior to when the offset accrues, the secured party has priority. *Bank of Kansas v. Hutchison Health Services*, 13 Kan.App.2d 421, 427, 773 P.2d 660, 665 (1989). Thus, the district court correctly determined West Bank had priority to the rebate funds. We affirm on this issue.

■ IV. *Mercury Marine's Counterclaim for Conversion.* Finally, Mercury Marine contends the district court erred in denying its counterclaim for conversion against West Bank. Mercury Marine claims the district court misinterpreted a security interest it held in the controverted inventory items. West Bank contends its security agreements and financing statement filed March 12, 1987, covers the inventory it repossessed and sold.

West Bank's documents contain the following description of its collateral: "All of the Debtor's inventory now owned or hereafter acquired...." MMAC's security agreement and financing statement filed November 26, 1984, and subsequently assigned to Mercury Marine identifies MMAC's collateral as follows:

All of Dealer's [DMBC] presently owned and hereafter acquired Inventory, and all Proceeds thereof. The term "Inventory" means all of the following types of goods held for sale or lease by Debtor, consisting of, but not limited to, marine engines, including parts, accessories and the like bearing the brand names Mercury, Mercruiser and Quicksilver, acquired by Debtor from Mercury Marine, and for which Secured Party [MMAC] has made an Advance on behalf of Dealer to Manufacturer [Mercury Marine].

Mercury Marine focuses on the phrase "consisting of, but not limited to" and claims this language gave it a security interest in *all* of DMBC's inventory. To determine whether all of DMBC's inventory is included in Mercury Marine's collateral, we must interpret the security agreement to ascertain the intent of the parties. There are two issues in this determination: whether the security agreement can be read objectively to include the controverted collateral and whether the parties to the agreement intended to include such collateral in their agreement. *American Employers Insurance Co. v. American Security Bank*, 747 F.2d 1493, 1500 (D.C.Cir. 1984).

The security agreement does not state "inventory" means *all* goods held for sale or lease. Rather, the agreement states *the following* goods held for sale or lease. The goods that follow are all qualified by the modifiers "acquired by Debtor from Mercury Marine, and for which [MMAC] has made an Advance." If the "consisting of, but not limited to" language is to have meaning at all, this description must mean those goods acquired from Mercury Marine and financed by MMAC, consisting of but not limited to those types of goods such as engines, parts and accessories bearing the enumerated brand names. Under this interpretation, the district court found MMAC had an interest in certain types of

marine products but only to the extent (1) they had the brand names of "Mercury, Mercruiser, and Quicksilver," (2) they were purchased from Mercury Marine, and (3) MMAC had made an advance on behalf of DMBC to Mercury Marine. In addition, the district court found the parties' intent or understanding of the language conformed to this interpretation. The inventory repossessed and disposed of by West Bank was comprised of engines, boats, parts, and accessories which were manufactured and sold by companies other than Mercury Marine. We hold the district court correctly rejected Mercury Marine's counterclaim for conversion. We affirm this issue.

V. *Conclusion.* We affirm the district court on all issues. Costs of this appeal are taxed to Mercury Marine.

AFFIRMED.

SCHLEGEL, P.J., concurs.

SACKETT, J., dissents.

SACKETT, Judge (dissenting).

I dissent. I would reverse the judgment in plaintiff-appellee West Des Moines State Bank's favor.

West Des Moines State Bank took a security interest in any rebates Des Moines Boating Center had coming from the defendant-appellant Brunswick Corporation. West Bank contends it is entitled to rebates allegedly owed Des Moines Boating Center for the year 1988. West Bank's claim is valid only if it can show defendant owed the rebates to Des Moines Boating Center.

The rebate program was available to dealers only if they were (1) contracted dealers, and (2) in good standing at the end of the calendar year. These requirements were conditions precedent to any obligation to pay the rebate. Conditions precedent are facts and events, occurring subsequently to the making of a valid contract, that just exist or occur before there is a right of immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available. *Nat'l Farmers Org'n. Inc. v. Lias,* 271 N.W.2d 751, 754 (Iowa 1978). There is no way under the facts here Des Moines Boating Center could be found to be a contracted dealer in good standing at the end of 1988.

West Bank and Des Moines Boating Center had written notice that Des Moines Boating Center's accounts with defendant and its subsidiaries had to be current as a precondition to the issuance of a rebate. West Bank had written notice of this prior to the time it attempted to take an assignment of Des Moines Boating Center's interest in the rebates. Neither Des Moines Boating Center nor West Bank objected. When the 1987 rebate was paid, $12,521.04 of the total rebate went to defendant to satisfy existing accounts. No objections were made by West Bank.

Des Moines Boating Center admitted it sold defendant's products out of trust and had no means or intention of paying for the products by the year's end. Des Moines Boating Center's financial condition prohibited it from purchasing products from defendant and paying its existing debt. By the end of 1988, the Des Moines Boating Center was in bankruptcy.

Considering these uncontroverted facts, there is no basis to find Des Moines Boating Center was a dealer in good standing at the end of 1988. I would reverse the judgment.