In re ACE SPORTS MANAGEMENT, LLC.

In re Elbert Crawford, III.

River Valley Bank of Russellville, Arkansas, Plaintiff,

v.

Ace Sports Management, LLC; Elbert Crawford, III; Derek Fisher; Ansu Sesay; Steve Conley; Anthony Hicks; David Sanders; National Bank of Arkansas; Union Bank of Bryant; Merchants and Planters Bank of Sparkman; Bonnie Johnson, Defendants.

Bankruptcy Nos. 00–43456M, 00–43455M.
Adversary No. 00–4162M.

United States Bankruptcy Court, E.D. Arkansas, Western Division.

Nov. 28, 2001.

Lance R. Miller, Mitchell Williams Selig Gates & Woodyard, Little Rock, AR.

Scott T. Vaughn, Hilburn Calhoon Harper Pruniski & Calhoun, Ltd., N. Little Rock, AR.

Darwin Davidson, Little Rock, AR.

Alex G. Streett, Russellville, AR.

James V. Coutts, Russellville, AR.

Isaac A. Scott, Jr., Wright Lindsey & Jennings, Little Rock, AR.

Randy Rice, Little Rock, AR, trustee.

Richard Ramsay, Grobmyer Ramsay & Ross, Little Rock, AR, trustee.

## *MEMORANDUM OPINION*

JAMES G. MIXON, Bankruptcy Judge.

On September 25, 2000, Ace Sports Management, LLC ("Ace") and Elbert Crawford, III ("Crawford") were adjudicated Debtors under the provisions of Chapter 7 of the United States Bankruptcy Code by virtue of involuntary petitions filed against them by creditors. The majority owner of Ace is Crawford. Thereafter, various pending state court proceedings involving the two debtors were removed to this Court pursuant to 28 U.S.C. §§ 1334 & 1452 (1994) and Federal Rule of Bankruptcy Procedure 9027.

The removed actions became Adversary Proceedings 00–4162, –4163, –4164, and –4165. The four suits were consolidated for a trial on the merits before the Bankruptcy Court at Little Rock, Arkansas, on July 24, 2001, under AP Number 00–4162.

The proceedings before the Court are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A),(K) & (O)(1994), and the

Court has jurisdiction to enter a final judgment in this case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FACTS

The issues raised by the various parties center on the disposition of commissions from a 1999 player/agent contract between Crawford, a sports agent, and Derek Fisher ("Fisher"), a professional basketball player for the Los Angeles Lakers ("Lakers"). Fisher hired Crawford as his sports agent prior to signing his first contract with the Lakers in 1996. Crawford and Fisher signed a standard player/agent contract on March 28, 1996.

Fisher was drafted by the Lakers in 1996 after he completed his last season at the University of Arkansas at Little Rock. He was picked 24th in the first round of the draft. A contract for a rookie player picked in the first round is for a term of three years, after which the player is free to negotiate a new contract. As a consequence of being picked in the first round, 80% of Fisher's compensation was fixed pursuant to applicable regulations issued by the National Basketball Association.

The NBA rules require a sports agent contracting with an NBA player to be an individual and not a business entity such as a corporation. Crawford formed Ace Sports Management, LLC ("Ace") in which to conduct his sports agent business, even though any player/agent contract he entered into would always be between the player and Crawford.

The NBA also regulates a player's contract with a sports agent. The fee a sports agent is entitled to receive is limited to 4 percent of the gross salary a player receives from the team. In the case of rookie players, the most an agent is entitled to is 4 percent of the additional 20% portion of the contract that is negotiable. For Fisher's rookie year in 1996, Crawford was successful in obtaining the maximum compensation Fisher could secure, which was $2.1 million, payable over three years.

Fisher played for the Lakers pursuant to his three-year contract and performed successfully. In the summer of 1999, Crawford negotiated a new contract with the Lakers on Fisher's behalf. The 1999 contract is for five years with an option in favor of Fisher to play two additional years for total compensation due Fisher of $21 million if he completes all seven years.

Fisher also signed a new standard player/agent contract with Crawford in July 1999. This contract provided that Crawford is entitled to a 4 percent commission payable annually from Fisher. The commission computes to $120,000.00 a year. By agreement between Fisher and Crawford, the first commission was to become payable in the summer following the 1999–2000 basketball season.

Prior to the consummation of the 1999 player/agent contract, Fisher received the proceeds of a loan made to him from National Bank of Arkansas ("NBA") on December 2, 1998, to start a clothing business. Fisher transferred the $85,000.00 in loan proceeds to Crawford, who then remitted $10,000.00 to Fisher for expenses already incurred. Crawford then deposited the remaining $75,000.00 into his accounts at Mercantile Bank on December 2, 1998. Apparently, Crawford did not use the $75,000.00 for the purpose intended because he testified that he still owes Fisher the money.

Meanwhile, Ace borrowed substantial sums of money during 1998 and 1999 from banks in Arkansas. Crawford had personally guaranteed all of Ace's obligations.

By August 1999, Ace and Crawford were in financial difficulty.[1]

During this period, Crawford had assigned his right to receive commissions from Fisher and other athletes to several banks. Crawford had also granted or attempted to grant security interests in his right to receive commissions from Fisher in order to secure his and Ace's debt to the banks. Crawford began to ask Fisher to advance some of the commissions on the 1999 contract, even though they were not yet due.

On August 13, 1999, Fisher paid Crawford $22,500.00, which Crawford testified was a payment on fees due to Crawford under the 1996 player/agent contract. On August 21, 1999, Fisher issued a check payable to Ace Sports Management in the sum of $120,000.00, which was the entire commission due Crawford for the 1999–2000 season.[2] The payment was directed to Ace at the instruction of Crawford. On November 14, 1999, Fisher paid Crawford a second advance on the commission due under the 1999 contract in the sum of $22,500.00 payable to Ace at Crawford's instruction.

In November 1999, Crawford met with Fisher in Los Angeles to discuss Crawford's financial problems. Crawford asked Fisher to introduce him to some contacts in Los Angeles who might help Crawford financially because he had exhausted his credit with banks in Arkansas.

Fisher thereafter introduced Crawford to Barry Garipedian ("Garipedian"), an employee of Salomon Smith Barney ("Smith Barney"), a large stock brokerage firm. Garipedian was Fisher's financial adviser and supervised Fisher's account at Smith Barney. The three discussed a proposal concerning a possible loan from Smith Barney to Crawford or Ace secured by Fisher's account at Smith Barney.

In anticipation of a possible agreement, Fisher executed, in blank, two letters of authorization to transfer funds, but with the specific understanding that nothing was to be transferred unless Fisher communicated his consent.[3] Fisher stated that he had reservations about the proposal because he did not want to be obligated to pay Crawford's debt to Smith Barney if Crawford failed to pay.

However, in November 1999, Fisher's account at Smith Barney was debited in the sums of $50,000.00 and $130,000.00 without Fisher's knowledge or approval, according to Fisher's testimony. The sum of $50,000.00 was transferred to River Valley Bank in Russellville ("River Valley") and applied to Ace's obligation to River Valley. The sum of $130,000.00 was transferred to NBA and was disbursed to creditors of Ace.[4]

Fisher did not learn of the unauthorized transfers until several weeks later when the transfers were brought to his attention by his father. Fisher was upset by what had happened and turned the matter over to his father.

As a result, Fisher terminated Crawford as his agent in December 1999. Fisher does not, however, dispute his obligation to pay Crawford all commissions due under

---

1. Crawford owed banks in Arkansas almost $2 million in August 1999.

2. Pursuant to the parties' agreement, this amount would not have been due until after the 1999–2000 basketball season concluded.

3. Fisher testified that he had endorsed letters of authorization in blank to Garipedian on previous occasions.

4. Apparently, no loan by Smith Barney was ever consummated, and the money was simply taken from Fisher's account, pursuant to instructions from Crawford to Garipedian.

the 1999 player/agent contract. Crawford has never repaid any of the $180,000.00 that was transferred from Fisher's brokerage account, any advance on commissions under the 1999 contract, or the sum of $75,000.00 transferred to Crawford in 1998 to fund Fisher's proposed apparel business.

Crawford acknowledged that he was the person who instructed Smith Barney to transfer the $130,000.00 to NBA and the $50,000.00 to River Valley in November 1999. Crawford testified that Fisher gave him the authority to withdraw the money from Smith Barney, but Fisher denies that he did so.

As will be discussed in detail, River Valley, Bonnie Johnson, NBA, Merchants and Planters Bank of Sparkman ("M & P"), and Union Bank of Bryant ("Union Bank") all claim perfected security interests in the commissions due under the 1999 player/agent contract between Crawford and Fisher.

Under the terms of the contract, Fisher owes $120,000.00 each year beginning with the 1999–2000 season through the 2003–2004 season. Fisher will owe an additional $120,000.00 for the 2004–2005 season and $120,000.00 for the 2005–2006 season if Fisher does not exercise his option to terminate the contract. The least amount owed by Fisher to Crawford is $600,000.00 and the maximum owed is $840,000.00.

The claims of the banks and Bonnie Johnson are as follows:

1. River Valley—$288,893.52;
2. NBA—$647,031.56;
3. Bonnie Johnson—$370,161.98;
4. M & P—$171,693.03;
5. Union Bank—$451,451.26;

These claims total $1,929,231.35.

Fisher claims the right to setoff for the following sums:

1. $ 75,000.00 of the $85,000.00 loan proceeds Fisher transferred to Crawford in December 1998;
2. $ 22,500.00 transferred to Ace August 13, 1999;
3. $120,000.00 advanced to Ace August 21, 1999;
4. $ 22,500.00 advanced to Crawford November 14, 1999;
5. $ 50,000.00 unauthorized transfer to Ace on November 18, 1999;
6. $130,000.00 unauthorized transfer to Ace on November 18, 1999.

The total claim of setoffs is $420,000,00. Fisher also claims the right to set off his attorney's fees incurred as a result of this litigation.

### DISCUSSION

#### I.

#### FISHER'S RIGHT TO SETOFF

The Bankruptcy Code provides:

(a) Except as otherwise provided ... this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

11 U.S.C. § 553(a) (1994).

■ This section does not create a right of setoff but merely preserves that right as it exists under nonbankruptcy law. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); *Austin v. Cockings (In re Cockings)*, 195 B.R. 915, 916 (Bankr.E.D.Ark. 1996).

■ Four elements prove right to setoff: (1) that the debt is mutual, that is, that each party has the right, in his own

name, to collect against the other, in his own right; (2) the debt owing to the creditor arose before the bankruptcy case; (3) the claim against the creditor arose before the bankruptcy case; and (4) the right to setoff exists under nonbankruptcy law. *In re Cockings*, 195 B.R. at 917 (citing *In re Whitaker*, 173 B.R. 359, 361 (Bankr. S.D.Ohio 1994); *In re MetCo Mining & Minerals*, 171 B.R. 210, 217 (Bankr. W.D.Pa.1994); *In re Glaze*, 169 B.R. 956, 964 (Bankr.D.Ariz.1994)).

■ The parties do not dispute that the debts owed by Fisher to Crawford and by Crawford to Fisher arose prepetition. Furthermore, it is clear that Arkansas law grants the right of setoff by virtue of the applicable statute, which provides: "A setoff may be pleaded in any action for the recovery of money and may be a cause of action arising either upon contract or tort." Ark.Code Ann. § 16–63–206(a) (Michie 1987).

M & P makes no separate argument regarding Fisher's right of setoff, but instead relies on the arguments of Union Bank, NBA, and River Valley. NBA does not argue the setoff issue in its brief.

River Valley and Bonnie Johnson state that setoff is precluded by Crawford's assignment of commissions to each of them. Their contentions related to the assignment will be addressed separately under Part VII below. They also advance other arguments against setoff as to various individual transfers from Fisher to Crawford, and these will be discussed in turn below.

Union Bank fully addresses the issue, basing its opposition to setoff on lack of mutuality and equitable grounds. Union Bank's first argument is that the check dated August 13, 1999, in the sum of $22,500.00 represented payment due Crawford on the 1996 player/agent contract and, thus, cannot be offset against commissions due Crawford under the 1999 player/agent contract.

The evidence conflicted as to whether this payment was made pursuant to the 1996 or 1999 contract. Fisher testified at trial that the payment was an advance on the 1999 contract, but in an earlier deposition he stated that "I would probably say that this check would close out Exhibit 6 [the 1996 contract]." (Tr. at 475.)

Crawford testified that the $22,500.00 check written August 13 was for "agent fees for 98–99, I believe on an ending balance of the old contract, to the best of my knowledge." (Tr. at 145.) He said this check probably correlated with an entry on the Client Fee Form (Fisher Ex. 6) which he submitted to Fisher. This entry was labeled "Paid in 1998." (Fisher Ex. 6.)

Fisher Exhibit 6, the Client Fee Form submitted to Fisher by Crawford in late summer of 1999, tends to corroborate Crawford's testimony. It appears to be an accounting of services rendered and fees paid up until September 14, 1999. This conclusion is based on the fact that the balance due to Crawford under this accounting was $19,320.00, a sum which Fisher subsequently paid on September 14, 1999.

The form shows that Crawford was due fees of $31,221.50 for arranging paid personal appearances and other promotional activities for Fisher from 1998 until August 1999. The form also shows that Crawford was due commissions of $10,599.00 under the 1996 player/agent contract for 1998 and $120,00.00 for 1999 under the 1999 contract. The total of fees and commissions due for 1998–1999, as reflected by the form, is $161,221.50. The form subtracts from this total the amount of $22,500.00 as payment by Fisher for 1998 fees and $120,000.00 as payment by

Fisher for 1999 fees. The form concludes that Fisher still owed Crawford $19,320.00.

Fisher concedes that this amount, $19,320.00, represented the final payment due for fees and commissions incurred under the 1996 contract. Fisher paid this amount on September 14, 1999, and does not attempt to set it off against fees due to Crawford under the 1999 contract.

Thus, the fee form characterizes the $22,500.00 check as a payment for 1998 services rendered. Furthermore, at the time of this accounting, Fisher had already paid the entire $120,000.00 payment due for the year under the 1999 contract. The $22,500.00 must have been applied to the agent fees of $41,820.50 that Fisher still owed under the 1996 contract. Otherwise, Fisher could not conclude that the $19,320.00 still owing was payment for 1998 fees earned ($41,820.50—$22,500.00 = $19,320.00).

Fisher has not established that the $22,500.00 check written by Fisher to Crawford on August 13, 1999, was payment for fees due under the 1999 contract and subject to setoff.

Union Bank also contends that the $120,000.00 payment dated August 27, 1999, cannot be setoff against the balance owed on the 1999 contract because the payment represented an advance on the 1999 contract. This argument has no merit, considering that Fisher seeks to offset fees he already paid to Crawford against total fees he owes to Crawford over the life

of the contract. Fisher is not arguing that he be given credit twice for the same payment, and it is undisputed that the payment was made.

Further, Union Bank alleges that Fisher has no right of setoff because of lack of mutuality between claims. The Bank states that Fisher's claim is against Ace, not Crawford, because some payments by Fisher were made to Ace. Union Bank's position is that Fisher cannot set off the $22,500.00 advance dated November 14, 1999, because the funds were used to pay Ace's payroll, and therefore, there is no mutual debt to offset. Union Bank also states that the $180,000.00 in transfers from the Smith Barney account cannot be offset because of lack of mutuality in that the funds were used to pay debts incurred by Ace, not Crawford.[5]

Union Bank makes the same argument regarding $50,000.00 of the $75,000.00 transfer from Fisher to Crawford on December 2, 1998, because Crawford put $50,000.00 of these proceeds in the Ace account.[6]

Union Bank's arguments are unavailing. Fisher did not owe Ace any money because his contract was with Crawford and under the contract, Fisher was indebted to Crawford, not Ace. Fisher only paid Ace at the direction of or to accommodate Crawford, who owned Ace. *See Hanssen v. DPP/ AAFES (In re Hanssen)*, 203 B.R. 149 (Bankr.E.D.Ark.1996) (holding that mutuality exists between a governmental entity

**5.** River Valley and Bonnie Johnson claim that $130,000.00 of the $180,000.00 transfer from the Smith Barney account cannot be offset because the transfer was authorized by Fisher and, therefore, subject to their earlier assignment. However, the Court finds Fisher's testimony credible that he did not authorize the transfers from his Smith Barney account.

**6.** Bonnie Johnson contends that the $75,000.00 transfer in December 1998 cannot

be offset because there is not enough evidence to show whether or how the money was used by Crawford after the transfer. While information on the disposition of these loan proceeds is scant, Crawford did testify that he still owes the $75,000.00 to Fisher. The Court infers from this admission that Crawford did not use the money for its intended purpose as start-up funds for an apparel business.

and a debtor even when the debtor's obligation is to a different governmental entity than that asserting setoff).

Finally, Union Bank raises the issue of unfairness in permitting Fisher the right of setoff of the $180,000.00 wrongfully withdrawn from Fisher's account at Smith Barney. The evidence in the record is that Fisher never authorized the withdrawal of $180,000.00 from his account and that these funds were disbursed at the direction of Crawford. The Court believes this testimony. However, Union Bank contends that Fisher, by signing stock transfer forms in blank and entrusting them to Garipedian, contributed to Crawford's ability to consummate the unauthorized withdrawal.

■ As previously stated, section 553 of the United States Bankruptcy Code does not create an independent right of setoff, but merely preserves setoff rights that exist under nonbankruptcy law, such as those provided by Arkansas statute. However, as asserted by a leading treatise on bankruptcy, "set off in bankruptcy is permissive rather than mandatory and ... application of the doctrine is committed to the sound discretion of the trial court...." 4 Collier on Bankruptcy ¶ 553.02[3] (Lawrence P. King *et al.* eds, 15th ed. rev.2001).

■ The exercise of the right of setoff should not be permitted when it would be inequitable. *United States v. Arkison (In re Cascade Roads, Inc.)*, 34 F.3d 756, 763 (9th Cir.1994) (holding inequitable conduct by government precluded government's exercise of setoff rights against the debtor) (quoting *United States v. Norton*, 717 F.2d

767, 772 (3d Cir.1983); *Camelback Hosp. Inc. v. Buckenmaier (In re Buckenmaier)*, 127 B.R. 233, 237 (9th Cir. BAP 1991); *Pieri v. Lysenko (In re Pieri)*, 86 B.R. 208, 210 (9th Cir. BAP 1988); *Parkway Plaza Investors v. Bacigalupi, Inc. (In re Bacigalupi, Inc.)*, 60 B.R. 442, 445 (9th Cir. BAP 1986)).

■ Even if setoff is authorized, the bankruptcy court has discretion to deny setoff when principles of equity so dictate. *Official Comm. of Unsecured Creditors v. Manufacturers & Traders Trust Co. (In re Bennett Funding Group, Inc.)*, 146 F.3d 136, 140 (2nd Cir.1998) (citations omitted); *DuVoisin v. Foster (In re Southern Indus. Banking Corp.)*, 809 F.2d 329, 332 (6th Cir.1987) (citations omitted); *Illinois v. Lakeside Community Hosp., Inc. (In re Lakeside Community Hosp., Inc.)*, 151 B.R. 887, 893 (N.D.Ill.1993) (citations omitted).

It is true that the banks holding claims secured by Fisher's contract had no part in the unauthorized withdrawal. If Fisher is permitted to exercise his right of setoff to the extent of $180,000.00, the creditor with lowest priority will have to bear a greater financial loss despite its secured status and its lack of knowledge of the transfers. Implicit in Union Bank's argument is that Fisher should exhaust his efforts to collect from Garipedian and/or Smith Barney before he is allowed the right of set off.

However, no party to these consolidated actions made Smith Barney or Garipedian a defendant under a theory of equitable subrogation,[7] contribution or some other

---

7. *See* 11 U.S.C. § 509 (1994). *See, e.g., Chemical Bank v. Craig (In re Glade Springs, Inc.)*, 826 F.2d 440 (6th Cir.1987) (creditor honoring letter of credit was entitled to equitable subrogation to rights of issuer of credit secured by debtor's deed of trust); *In re Bugos*, 760 F.2d 731, 734 (7th Cir.1984) (co-tenant,

who made payments on contract for sale, was subrogated to rights of creditor he paid); *In re Russell*, 101 B.R. 62, 65 (Bankr.W.D.Ark. 1989) (where co-maker on note sold collateral to debtor, who assumed seller's debt on note, and co-maker subsequently paid debtor's obli-

theory. The record does not establish indisputably that Fisher has a right to recover the full amount of the unauthorized transfer plus interest and attorney's fees from Garipedian or Smith Barney. Without such proof, the Court would have to speculate as to the probable outcome of any litigation between Fisher and Smith Barney and/or Garipedian. Fisher's right of recourse to litigation is not the equivalent of recourse to collateral. For example, if Fisher had a right to recourse to a perfected security interest in collateral, the exercise of his right of setoff might be inequitable. *See In re Cabrillo,* 101 B.R. 443 (Bankr.E.D.Pa.1989) (holding setoff not applicable when creditor seeks to foreclose property subject to security interest).

For the reasons stated, Fisher will be permitted to exercise his right of setoff against Crawford in the total sum of $397,500.00 plus attorney's fees in an amount to be determined after notice and a hearing.[8]

## II.

## RIVER VALLEY BANK'S CLAIM OF A PERFECTED SECURITY INTEREST

Beginning in June 1998, River Valley made a series of loans to Ace. The loans were evidenced by a series of notes executed by Crawford as President of Ace. The notes were all made in the name of Ace Sports Management, LLC and were signed "Ace Sports Management, LLC By: Elbert Crawford, III, President" or "By: Elbert Crawford, III." All of the notes are personally guaranteed by Crawford. These notes culminated·in Note Number

2000553 dated February 2, 2000, in the principal sum of $251,174.63.

In order to secure repayment of the indebtedness owed to the bank, a series of combination security agreement and financing statement was executed, each document naming River Valley as the secured party. The first security agreement and financing statement is dated June 9, 1998. The Debtor's name appears in the upper left-hand corner as "Ace Sports Management, LLC," and the collateral described is "standard player agent contract between Elbert Crawford, III (Agent) and Ansu Sesay (Player)." A box marked with an "X" is following by the language: "All rights I have now and that I may have in the future to the payment of money...." (River Valley Ex. 3.)

The security agreement and financing statement is signed by the typed signature "Ace Sports Management, LLC," and beneath is Elbert Crawford, III's written signature and the name "Elbert Crawford, III" typed under the handwritten signature. The signature line does not designate Crawford as President of Ace. The financing statement was filed with the Secretary of the State of Arkansas on June 15, 1998, and with the Circuit Clerk of Pulaski County, Arkansas, on June 12, 1998. (River Valley Exs. 3 and 4.)

A second financing statement and security agreement dated July 17, 1998, was executed in the same fashion and filed of record with the Secretary of State and with the Circuit Clerk of Pulaski County, Arkansas, on July 28, 1998. A third security agreement and financing statement was executed in the same fashion as the previous two on November 5, 1998, and was filed of record November 12, 1998,

---

gation on note, co-maker not entitled to subrogation for debt he paid on behalf of debtor.)

**8.** Fisher's right to attorney's fees is provided for by Arkansas law. *See* Ark.Code Ann. § 16–22–308 (Michie 1999); Arkansas Rule of Civil Procedure 22(b).

with the Secretary of State and on November 10, 1998, with the Circuit Clerk of Pulaski County, Arkansas.

A fourth financing statement was filed of record on September 7, 1999. The Debtor's name was typed in the upper left-hand corner as "Ace Sports Management, LLC," and the secured party was identified as River Valley Bank. The document filed was not signed on its face, but referred to an attachment. The attachment was a document titled "Assignment." Dated September 1, 1999, the document purports to assign Crawford's fees pursuant to the 1999 player/agent contract with Fisher. The assignees are listed as River Valley and Bonnie Johnson.

The document bears the following signature lines:

---

Assignor, Elbert Crawford, III

---

Guarantor, Derek Fisher
Ace Sports Management by

---

River Valley Bank by

---

Bonnie Johnson:

---

(River Valley Ex. 27.) Each signature line bears the handwritten signature of the party indicated beneath or beside the blank. Crawford's signature is also written beside the Ace Sports Management line and James Biggers' signature is signed beside the River Valley line.

All parties agree that the Arkansas version of the Uniform Commercial Code governs this dispute.[9] The collateral in question is an account, meaning "right to payment ... for services rendered...."

Ark.Code Ann. § 4–9–106 (Michie 1991 & Supp.1999). In order to perfect a security interest in an account such as the one in question, the creditor must file a financing statement. Ark.Code Ann. § 4–9–302 (Michie 1991 & Supp.1999).

The proper place to file a financing statement to perfect a security interest in an account is in the Office of the Secretary of State and, since the Debtor in this case has a place of business in only one county, the Circuit Clerk of that county. Ark. Code Ann. § 4–9–401(c) (Michie 1991). A security interest attaches to an account when the debtor signs a security agreement describing the account sufficiently, the creditor has given value for its security interest in the account, and the debtor has acquired rights in the account. Ark.Code Ann. § 4–9–203(a)–(c) (Michie 1991 & Supp.1999); *Findley Machinery Co. v. Miller*, 3 Ark.App. 264, 268, 625 S.W.2d 542, 544 (1981).

The Arkansas Code defines the term "Debtor" as follows:

"Debtor" means the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in any provision of the chapter dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires....

Ark.Code Ann. § 4–9–105(1)(d) (Michie 1991 & Supp.1999).

A security agreement that provides for a security interest in after-ac-

---

9. The extensive revisions to Article 9 of the Uniform Commercial Code that took effect in Arkansas in 2001 are not applicable in resolving the issues in the instant case, which arise out of events occurring before the revisions were adopted.

quired property is valid and will create a security interest when the debtor acquires rights in the collateral and all of the other requirements for creating a security interest have been met. Ark.Code Ann. § 4–9–204 (Michie 1991); *Tradax America, Inc. v. First Nat'l Bank (In re Howell Enter., Inc.)*, 105 B.R. 494, 499 (Bankr.E.D.Ark. 1989), *rev'd on other grounds*, 934 F.2d 969 (8th Cir.1991). The security interest in an after-acquired account becomes effective when the after-acquired account is created, but the date of perfection is the date the financing statement is filed. Ark.Code Ann. § 4–9–303(1)(Michie 1991); *Bank of the West v. Commercial Credit Fin. Servs., Inc.*, 852 F.2d 1162, 1166 (9th Cir.1988); *In re Howell Enter.*, 105 B.R. at 499 (citations omitted).

 Where, as in this case, there are competing security interests and perfection is accomplished by filing, the secured party has priority who files before the other secured party. This is so regardless of the first filer's prior knowledge of other existing security interests. Ark.Code Ann. § 4–9–312(5)(a) (Michie 1991 & Supp. 1999); *Alaska v. Fowler*, 611 P.2d 58, 60 n. 3 (Alaska 1980) (ruling that perfected security interest prevails over prior unperfected interest even if perfecting party had notice of prior interest when he took his interest) (citing *In re Smith*, 326 F.Supp. 1311 (D.Minn.1971)); 4 James J. White & Robert S. Summers, Uniform Commercial Code, § 33–4 at 317 (4th ed.1995) (hereinafter "White & Summers") (discussing the fact that secured party who wins the race to the courthouse to file is superior without regard to the state of his knowledge).

River Valley claims a perfected security interest in the 1999 contract between Fisher and Crawford. The bank states that this security interest has priority over all other claimants by virtue of its filing on July 28, 1998. See River Valley Exhibits 12 and 13.

The other banks argue that River Valley is unperfected for two reasons. First, they contend that the security agreements in favor of River Valley were executed by Crawford on behalf of Ace, which never owned any interest in the contract between Fisher and Crawford.

Second, the opposing banks argue that the financing statement filed of record designates Ace as the Debtor and thus, is not in compliance with section 4–9–105(a)(d), which defines "debtor" as one having rights in the collateral. Thus, the contention is that even if Crawford gave River Valley a security interest, River Valley is unperfected because the financing statement is seriously misleading in naming Ace, rather than Crawford, as the debtor.

River Valley points out that the notes, which were executed by Crawford on behalf of Ace, added the words "By" and "President" on the signature line. River Valley argues, therefore, that the security agreement and financing statement must have been executed by Crawford individually because they do not contain the words "By" and "President."

River Valley cites two cases construing a Uniform Commercial Code provision on negotiable instruments to the effect that a maker of a note who signs a note on behalf of a corporation and who fails to designate his office in the corporation remains personally liable on the note. Those cases are *United Fasteners, Inc. v. First State Bank of Crossett*, 286 Ark. 202, 691 S.W.2d 126 (1985) and *Fanning v. Hembree Oil Co.*, 245 Ark. 825, 828–29, 434 S.W.2d 822, 824 (1968).

However, these cases do not apply to the issue before the Court. Each of the cited cases interprets section 4–3–402 of the Arkansas Code, which states that a

representative who signs his name to an instrument is personally obligated if the instrument does not show the signature was executed in a representative capacity. This section of the Arkansas Code applies to negotiable instruments, not to secured transactions, which are governed by the provisions of Article 9 of the Uniform Commercial Code. *See generally* 2 White & Summers, *supra*, § 16–5 (discussing personal liability as related to signature requirements of section 3–402).

██ River Valley's argument was addressed in detail by the court in a case arising out of the state of Maryland. *See Plemens v. Didde–Glaser, Inc.,* 244 Md. 556, 224 A.2d 464 (1966). In that case the financing statement identified the corporate debtor correctly but the signature of its president gave no indication at all that it was signed in a representative capacity.

In upholding the validity of the financing statement the court stated,

> Appellant argues that the signature of an individual is not the signature of a corporation and that the signature of an individual can not authenticate a corporate signature. He cites as controlling 3–403(2)(a) and (b) which obligates personally an authorized representative who signed an instrument for a principal in his own name without indicating any representative capacity, and Code (1957) Article 23, section 5(a)(1), which sets out prerequisites for corporate names. No personal liability is created by the execution of a financing statement.... A signed financing statement is filed for the purpose of showing that the statement is genuine and can be accepted for filing.

*Plemens,* 244 Md. at 562–63, 224 A.2d 464(citing *Benedict v. Lebowitz,* 346 F.2d 120 (2d Cir.1965); *In re Carlstrom,* 3 U.C.C.Rep.Serv. 766, 1966 WL 8962 (Bkrtcy.D.Me.1966); *Lincoln Bank &*

*Trust Co. v. Queenan,* 344 S.W.2d 383 (Ky.1961);Uniform Commercial Code § 9–402 cmt. 1).

Thus, the signature under 3–402 serves a different function than does the signature under 9–402. Therefore, any attempt to analogize the two sections is misplaced.

The instrument in question, the July 28, 1998 security agreement-financing statement, was prepared by River Valley, according to the testimony of River Valley's president, James Biggers ("Biggers"). Elbert Crawford's name does not appear in the place designated on the form as "Debtor". The instrument has a box identifying the debtor as a corporation, not an individual.

Under the applicable rules, the "debtor" referred to by the form should be the owner of the collateral or have rights in the collateral. *See* Ark.Code Ann. § 4–9–203(1)(c) (Michie 1991 & Supp.1999) (a security interest is not enforceable unless the debtor has rights in the collateral); Ark Code Ann. § 4–9–105(1)(d)(Michie 1991 & Supp.1999) (in an Article 9 provision dealing with collateral, "debtor" means the owner of the collateral).

The other documents introduced into evidence not relating to perfection, such as the assignment and the personal guarantees, are executed by Elbert Crawford, III, without reference to Ace Sports Management, LLC. Biggers testified that the financing statement and security agreement were intentionally prepared in the manner they were because in his opinion, "I considered [Ace and Crawford] co-debtors." (Tr. at 105.)

However, the evidence, including all documents construed together, supports the inference that River Valley either misunderstood or overlooked the requirements of section 4–9–203(1)(c) of the Arkansas Code with regard to attachment of a secu-

rity interest where the collateral is owned by someone other than the maker of the note.

The signature here clearly indicates that Crawford is signing the document on behalf of the corporation and not individually because the debtor is identified as the corporation and the name of the corporation appears immediately above Crawford's signature.

If River Valley's intent was to reflect Crawford as the debtor who was conveying a security interest to it, there would be no purpose served by designating Ace Sports Management as the debtor and preparing a signature line for Crawford to sign immediately below the typed name, "Ace Sports Management LLC". Based on this evidence, the Court finds that River Valley was not granted a security interest in the 1999 player/agent contract between Crawford and Fisher.

■■■ Even if River Valley had effectively obtained a security interest in the 1999 Fisher/Crawford contract, it did not file a proper financing statement. One of the requirements for a financing statement to be effective is that "it gives the names of the debtor and the secured party ... [and] is signed by the debtor...." Ark.Code Ann. § 4–9–402(1)(Michie 1991 & Supp. 1999). A financing statement "substantially complying with the [above] requirements ... is effective even though it contains minor errors which are not seriously misleading." Ark.Code Ann. § 4–9–402(8)(Michie 1991 & Supp.1999).

■■■ If the errors are seriously misleading, then the financing statement is not effective to perfect a security interest. *Northern Comm. Corp. v. Friedman (In re Leichter)*, 471 F.2d 785, 787 (2d Cir.1972); *Clarence Graphics, Inc. v. Owen (In re Clarence Graphics, Inc.)*, 201 B.R. 46, 47 (Bankr.W.D.N.Y.1996); *In re Wallace*, 61

B.R. 54, 57 (Bankr.W.D.Ark.1986)(citing *In re Thomas*, 466 F.2d 51 (9th Cir.1972); *In re Hill*, 363 F.Supp. 1205 (N.D.Miss.1973); *In re Platt*, 257 F.Supp. 478 (E.D.Pa.1966); *In re Fowler*, 407 F.Supp. 799 (W.D.Okla. 1975)).

■■■ As stated by Judge Morris Arnold, " 'the bottom line [to test sufficiency] is whether a third party searcher would be reasonably likely to find the financing statement.' " *Armstrong v. Dakota Bank & Trust Co. (In re Knudson)*, 929 F.2d 1280, 1283 (8th Cir.1991)(quoting B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code § 2.09(1)(a) at 2–71 (2d ed.1988)).

In this case, as in *Knudson* cited above, a third party searcher looking for a prior financing statement under the name "Elbert Crawford" would not find the financing statement in question. River Valley proved this point with its own witness who introduced the results of a UCC search by the Secretary of State. (*See* River Valley Ex.35.)

The Secretary of State search found financing statements in favor of River Valley listing Ace as the debtor, but none listing Elbert Crawford, III as the debtor. As stated by the authors of a leading treatise on the Uniform Commercial Code, "One should understand why the debtor's name on the financing statement is important and why courts are appropriately concerned about it. The filing officer uses the debtor's name to compose the index and subsequent parties use the index to find the filing." 4 White & Summers, *supra*, § 31–18 at 201–202.

Therefore, even if River Valley possessed a security interest in the 1999 contract, it was not perfected because the financing statement listed the debtor as Ace, which did not own the collateral. *See, e.g., In re Leichter*, 471 F.2d at 786 (ruling

that financing statement filed only under trade name was insufficient because not filed under name of individual who was the legal debtor under the statute).

■ River Valley makes an additional argument in its reply brief. River Valley states that Crawford gave Ace permission to use the Fisher contracts as collateral; therefore, the security agreement-financing statement given by Ace is valid pursuant to section 4–9–203 of the Arkansas Code. Prior to River Valley's argument in its Reply Brief, all parties, including River Valley, had argued that the right to receive the Fisher payments belonged exclusively to Crawford individually. (*See* Post–Trial brief for River Valley Bank at 4.)

There is some case law upholding the validity of a financing statement where the statement is signed by one who is not the lawful owner of the collateral. *See, e.g., United States Small Bus.Admin. v. Guaranty Bank & Trust Co. (In re Whatley)*, 874 F.2d 997, 1004 (5th Cir.1989) (holding that by corporate resolution, individual consented to allow corporation to pledge individual's collateral such that corporation had rights in collateral); *Merchants Bank v. Atchison (In re Atchison)*, 832 F.2d 1236 (11th Cir.1987) (ruling that equipment owner's signature in corporate capacity on chattel mortgage gave corporation rights in collateral); *Wawak v. Affiliated Food Stores, Inc.*, 306 Ark. 186, 188, 812 S.W.2d 679, 680 (1991) (finding that buyer of store had rights in inventory before sale completed such that buyer's supplier had an attached security interest in inventory). *See generally* 4 White & Summers, *supra*, § 31–6 at 128.

However, in this case there is no evidence that Crawford transferred any right to Ace to receive his agent commissions from Fisher. The only evidence on this subject was that these commissions are required to be paid to an individual by National Basketball Association regulation. Therefore, River Valley's alternative argument is without merit.

## III.

### BONNIE JOHNSON'S CLAIM OF A PERFECTED SECURITY INTEREST

■ Bonnie Johnson ("Mrs.Johnson") claims a perfected security interest in the 1999 player/agent contract between Fisher and Crawford to secure a debt owed to her in the sum of $370,161.98. She contends that her claim is subordinate only to the claim of River Valley.

In April or May 1999, Mrs. Johnson made a loan to Crawford for the sum of "around $300,000.00." (Tr. at 212.) She borrowed the money she lent Crawford from River Valley. Mrs. Johnson testified that she could not remember if she even signed a note in favor of the bank and also said that she did not know what a promissory note looks like.

She stated that the idea of the loan to Crawford was proposed to her by her husband, James H. Johnson, who is a member of the Board of Directors of River Valley, and Biggers, President of River Valley. James Johnson testified that he was "a party to it. I did not exactly arrange it." (Tr. at 204.) He stated that he was excused from the board meeting when the loan to Mrs. Johnson that funded the Crawford loan was discussed.

Mrs. Johnson could not remember the terms of her loan from the bank, such as the date of maturity or the interest rate. She testified that the loan proceeds from River Valley were transferred into her account, but also stated that the loan proceeds from the Bank were never disbursed to her directly, and instead were trans-

ferred to a "loan account" and from there to Crawford's account. Mrs. Johnson could not explain what she meant by a "loan account." (Tr. at 238.)

With regard to the transaction between Mrs. Johnson and Crawford, she testified that Crawford signed a promissory note in her favor (Tr. at 212), but also said there was no note. (Tr. at 204.) Furthermore, she could not recall the interest rate assessed on the loan to Crawford.

The monies lent to Mrs. Johnson by River Valley have since been repaid by her from her personal resources. The only document she introduced to corroborate her testimony was a copy of her check to River Valley Bank in the sum of $235,276.03, dated October 4, 2000. Admitted without objection, the copy of the check revealed only the front of the document without evidence of bank markings or notations on the back.

Totally uninformed of the details of the transactions, Mrs. Johnson has failed to produce documentary evidence to support her testimony. The Court draws a negative inference from her failure to produce the documents supporting her claim, especially in view of the discrepancies in her testimony. Even though River Valley surely possesses the records to show how the loan proceeds were disbursed to Mrs. Johnson and then to Crawford, neither River Valley nor Mrs. Johnson chose to offer them.

On this record, the evidence leaves considerable doubt that Mrs. Johnson made a bona fide loan to Crawford. When asked why the bank did not make the loan directly to Crawford instead of involving Mrs. Johnson, Biggers stated, "[W]e just felt it was time that we needed to back off...." (Tr. at 103.)

When asked whether the loan to Crawford would have exceeded River Valley's loan limit of $500,000.00, Biggers replied that it would not. However, it is noteworthy that the record here establishes that the claims of River Valley and Mrs. Johnson total approximately $660,000.00, without counting a $50,000.00 payment transferred from Fisher's Smith Barney account to River Valley in November 1999.

As to Mrs. Johnson's claim of a perfected security interest in the 1999 player/agent contract, she supports her claim by relying on the assignment dated September 1, 1999, by Crawford of his right to receive commissions from Fisher. This assignment, which purportedly was made jointly to River Valley Bank and Mrs. Johnson, was attached to a financing statement filed of record on September 1, 1999, with the Circuit Court of Pulaski County, Arkansas, and on September 7, 1999, with the Secretary of State. (See River Valley Exs. 27 and 28.)

The financing statements showed River Valley as the secured party and Ace Sports Management as the debtor. Neither statement was signed by Mrs. Johnson or listed her as a secured party, although she signed the attached assignment document.

 Under applicable Arkansas law, a security agreement is "an agreement which creates or provides for a security interest." Ark.Code Ann. § 4–9–105(1) (Michie 1991 & Supp.1999). A document which does not purport to grant a security interest cannot be relied on as a security agreement. *Meeks v. First Bank of South Ark. (In re Tracy's Flowers & Gifts, Inc.)*, 264 B.R. 1, (Bankr.W.D.Ark. 2001) (document purported to be a security agreement communicates parties' intent to provide for security interest); *Gibbs v. King*, 263 Ark. 338, 342, 564 S.W.2d 515, 517 (1978) (no grant of security interest existed in collateral, even though a financ-

ing statement was filed); *Central Ark. Milk Producers Assoc. v. Arnold,* 239 Ark. 799, 801, 394 S.W.2d 126, 127 (1965) (note which did not create lien or retain title cannot serve as a security agreement).

Mrs. Johnson has produced no evidence that Crawford granted her a valid security interest in the 1999 Fisher contract with Crawford by the execution of a security agreement. There is no language in the assignment or on the face of the financing statement that purports to convey a security interest to Mrs. Johnson such that either document might be construed as a security agreement.

Moreover, as discussed with regard to River Valley, the erroneous listing of the debtor as "Ace" rather than Crawford is also fatal to Mrs. Johnson's claim of a perfected security interest. Therefore, Mrs. Johnson's claim to a perfected security interest in the 1999 player/agent contract between Fisher and Crawford is unsupported by law or fact.

## IV.

## NATIONAL BANK OF ARKANSAS' CLAIM OF A PERFECTED SECURITY INTEREST

Beginning in January 1998, NBA made a series of loans to Ace that were personally guaranteed by Crawford. After numerous renewals and new advances, Ace is indebted to NBA in the sum of $647,031.56, as of July 25, 2001.

In connection with a loan from NBA, Crawford executed a security agreement on February 27, 1998. The collateral included Crawford's accounts and other future rights to payment. The security interest granted by Crawford was never perfected through a properly filed financing statement.

On April 28, 1998, NBA filed a financing statement and security agreement dated April 20, 1998, with the Secretary of State and Circuit Court Clerk of Pulaski County. (NBA Exs. 22, 23.) The Debtor is identified as "Elbert Crawford, III," and the financing statement is signed by Elbert Crawford, III. The collateral is identified as the 1996 contract between Fisher and Crawford and the 1995 contract between Crawford and Corliss Williamson.

Although the financing statements were filed properly with the Secretary of State and the Circuit Clerk of Pulaski County, Arkansas, the collateral listed does not describe the 1999 contract between Fisher and Crawford by specific reference. Furthermore, the description of the collateral does not include notice of a claim of a security interest in after-acquired property.

On May 4, 1999, NBA filed a combination financing statement and security agreement with the Secretary of State of Arkansas. The document listed Elbert Crawford as the debtor, and Elbert Crawford, III, in his individual capacity, signed the document as debtor. NBA filed the document with the Circuit Clerk of Pulaski County, Arkansas, on May 21, 1999. The description of the collateral included "[a]ll rights I have now and that I may have in the future to the payment of money...." (NBA Exs. 49 & 50.)

NBA contends in its brief that its security interest in the 1999 Fisher/Crawford contract has priority over that of the other banks and Mrs. Johnson by virtue of its 1998 filings. Its first argument is that all of the other claimants to a perfected security interest in the 1999 Fisher/Crawford contract had actual knowledge of NBA's prior unperfected security interest in Crawford's future rights to payment. NBA asserts that because of the other claimants' actual knowledge, NBA was not

required to file and that the other claimants are estopped to claim a priority.

NBA bases its argument on the theory that the UCC embraces the concept of actual notice, as exemplified in section 4–9–401(2). This section provides that a filing in an improper place is effective against any person who has knowledge of the contents of the improperly filed financing statement. Ark.Code Ann. § 4–9–401(2) (Michie 1991). However, this provision is not applicable in the instant case, where the dispute is over priority of conflicting security interests in the same collateral and does not involve a financing statement filed in the wrong location.

The proper code section to apply is section 4–9–312(5)(a), which instructs how to determine priority between conflicting security interests. The section provides that priority dates from the time a filing is first accomplished covering the collateral or the time the security interest is first perfected, whichever is earlier. Ark.Code Ann. § 4–9–312(5)(a) (Michie 1991 & Supp.1999). *J.J. Faulkner v. Contractor's Glass Co. (In re Contractor's Glass Co.)*, 152 B.R. 270, 272 (Bankr.W.D.Ark.1992) (citing *Affiliated Food Stores, Inc. v. Farmers & Merchants Bank*, 300 Ark. 450, 780 S.W.2d 20 (1989)).

■ A perfected security interest prevails over a prior unperfected security interest, even if the perfecting party had notice of the prior interest when he took his security interest. *Sacks v. Rothberg, (In re Rothberg)*, 127 B.R. 294, 296 (Bankr. D.C.1991); *Fowler*, 611 P.2d at 60 n. 3.

Therefore, NBA's unperfected security interests will not take priority over security interests perfected by others, regardless of whether the other secured parties had knowledge of NBA's prior unperfected security interest.

■ The second argument advanced by NBA is that its financing statement filed April 1998 created a perfected security interest in the 1999 Fisher/Crawford contract even though the description of the collateral in the financing statement did not refer either generally or specifically to the 1999 contract. NBA argues that the reference to the 1996 Fisher/Crawford contract was sufficient to put interested parties on notice that NBA also claimed a security interest in the 1999 contract.

NBA's only authority for this proposition is the case of *In re Fogarty*, 114 B.R. 788, 792 (Bankr.S.D.Fla.1990). The court in *Fogarty* held that the intrinsic value of older thoroughbred mares is the ability to produce foals. The court concluded that the description of mares in the financing statement was sufficient to describe the mares' offspring, even though the offspring were not specifically referenced in the collateral description.

However, the facts in *Fogarty* are not analogous to the facts in the instant case. Each player/agent contract was negotiated and agreed upon separately as required by the National Basketball Association rules. In testimony, Fisher specifically addressed the issue of whether a new player/agent contract was negotiated. He explained that, "after ... the '96 contract expires ... I'm basically unemployed again. So in order for someone to represent me ... I have to hire an agent ... because the '96 deal was over, it requires your agent as well as yourself to sign a new player agent contract." (Tr. at 412.)

It is true that some collateral by its nature is bound to include after-acquired property because the collateral is constantly turning over; therefore, the collateral is usually considered as a single entity. *American Employers Ins. Co. v. American Sec. Bank*, 747 F.2d 1493, 1500 (D.C.Cir. 1984) (citing *Manchester Nat'l Bank v.*

*Roche,* 186 F.2d 827 (1st Cir.1951); *Rosenberg v. Rudnick,* 262 F.Supp. 635 (D.Mass. 1967); *In re Platt,* 257 F.Supp. 478 (E.D.Pa.1966)). But the collateral in this case is not of that category.

If in the April 1998 financing statement NBA intended to describe future contracts between Fisher and Crawford as collateral, the bank could have simply placed a mark in the appropriate box adjacent to a printed provision describing after-acquired rights. NBA either neglected to check the appropriate box or did not intend to do so.

Therefore, NBA did not perfect its security interest in the 1999 Fisher/Crawford contract until May 1999 when it filed a financing statement with a statement describing the 1999 contract as collateral as required by sections 4–9–110 and 4–9–402. *See* Ark.Code Ann. § 4–9–110 (Michie 1991) (description is sufficient if it reasonably describes collateral); Ark.Code Ann. § 4–9–402(1) (Michie 1991 & Supp.1999)(sufficient financing statement indicates the types or specific items of collateral). *See also Ward v. First Nat'l Bank,* 292 Ark. 21, 23, 728 S.W.2d 149, 150 (1987) (ruling that financing statement must have a description broad enough to encompass after-acquired property in order to perfect security interest in after-acquired property) (citing *Security Tire & Rubber Co. v. Hlass,* 246 Ark. 1113, 441 S.W.2d 91 (1969); *United States v. Riceland Foods, Inc.,* 504 F.Supp. 1258, 1262 (E.D.Ark.1981)).

### IV.

### MERCHANTS AND PLANTERS BANK'S CLAIM OF A PERFECTED SECURITY INTEREST

■ On September 25, 1998, a promissory note in favor of M & P in the sum of $150,000.00 was executed by Ace and by Crawford and his wife Andreia Crawford, both individually. The note was due to be repaid on demand and if no demand then on September 24, 1999.

On September 24, 1998, Ace, Crawford and Andreia Crawford, individually, executed a security agreement in favor of M & P to secure all debts now and in the future. Several items of collateral were described in the security agreement including "Standard Player Agent Contract regarding Derek Fisher dated March 28, 1996, and subsequent agreements made thereto." (M & P Ex. 2.)

In order to perfect its security interest, M & P caused a financing statement to be filed on September 24, 1998, with the Secretary of State and on September 30, 1998, with the Circuit Clerk of Pulaski County, Arkansas. The Debtors are identified in the upper left corner as Ace Sports Management, LLC; Elbert Crawford, III; and Andreia Crawford. The collateral described in the financing statement included "Standard Player Agent Contract regarding Derek Fisher dated March 28, 1996, and subsequent agreements made thereto."

■ With regard to secured transactions, the Arkansas Code provides: "any description of personal property . . . is sufficient whether or not it is specific if it reasonably identifies what is described." Ark.Code Ann. § 4–9–110 (Michie 1991). As stated ·by White and Summers, "The primary function of the description in 9– 402 is to put third parties on notice." 4 White & Summers, *supra,* § 31–4 at 107.

Union Bank argues that the phrase "subsequent agreements thereto" used in connection with the description of the 1996 player/agent contract between Fisher and Crawford is ambiguous and can reasonably be interpreted as meaning subsequent agreements related only to the 1996 contract.

M & P argues that the phrase "subsequent agreements thereto" should reasonably be interpreted as referring to subsequent agreements between Fisher and Crawford. Under M & P's interpretation, the collateral description would include the 1999 Fisher/Crawford contract and would satisfy the description requirements as specified by law. See Ark.Code Ann. § 4–9–402(1)(Michie 1991 & Supp.1999) (financing statement is sufficient if it describes the types or items of collateral).

The phrase "subsequent agreements" standing alone would clearly refer to agreements between Fisher and Crawford executed after the 1996 contract and would include the 1999 contract at issue. However, the addition of the word "thereto" at the end of the phrase results in ambiguity. "Thereto" is defined as "to it, to that." New Webster's Dictionary and Thesaurus of the English Language 1025 (1992). Union Bank argues that the word "thereto" refers only to the 1996 contract. However, this argument seems illogical since the specific reference to the 1996 contract would include and not exclude any amendments to it.

Steve Davis of M & P's holding company entered into the loan agreement with Ace and the Crawfords on M & P's behalf. He testified that the bank intended the description to include any subsequent contract between Fisher and Crawford because at the time of the loan, the 1996 contract would expire in one year and would not be sufficient to fund the loan. M & P's security interest was perfected by filings completed in September 1998.

■ There is no statutory requirement that the phrase "after-acquired property" must appear in the financing statement to perfect an interest in after-acquired property. *American Employers Ins. Co. v. American Sec. Bank,* 747 F.2d 1493 (D.C.Cir.1984) (rejecting the idea that the

security agreement "must specifically contain the talisman of 'after-acquired property' or its equivalent")(quoting *Frankel v. Associates Fin. Servs. Co.,* 281 Md. 172, 377 A.2d 1166, 1168 (1977) and citing *In re Nickerson & Nickerson, Inc.,* 329 F.Supp. 93, 96 (D.Neb.), *aff'd,* 452 F.2d 56 (8th Cir.1971); *In re Fibre Glass Boat Corp.,* 324 F.Supp. 1054, 1056 (S.D.Fla.), *aff'd,* 448 F.2d 781 (5th Cir.1971); *In re Middle Atlantic Stud Welding Co.,* 503 F.2d 1133, 1137 (3d Cir.1974) (dissenting opinion)). *See also* 4 White & Summers, *supra,* § 31–18 at 209.

In *Ward v. First National Bank,* the financing statement described the collateral by a list of specific items. The Arkansas Supreme Court held that the description of the collateral was not sufficient to include after-acquired property. The Court observed, however, that a description in a financing statement is sufficient even without making reference to after-acquired property if the description itself suggests inquiry which would enable the third party creditor to identify after-acquired property. *Ward v. First Nat'l Bank,* 292 Ark. 21, 23, 728 S.W.2d 149, 150 (1987)(citing *Security Tire & Rubber Co. v. Hlass,* 246 Ark. 1113, 441 S.W.2d 91 (1969)).

■ In the case of *Security Tire and Rubber Company v. Hlass,* the Arkansas Supreme Court found that collateral described in the financing statement as "customer accounts receivables and Company owned inventory" was sufficient to include after-acquired collateral. *Security Tire & Rubber Co.,* 246 Ark. at 1114, 441 S.W.2d at 92. The court adopted the principle that "a description is sufficient which will enable third persons, aided by inquiries *which the instrument itself suggests,* to identify the property." *Security Tire & Rubber Co.,* 246 Ark. at 1117, 441 S.W.2d

at 94 (citing Harry Meek, 18 Ark. L.Rev. 30 (1964))(emphasis added).

The so-called inquiry test has support in many jurisdictions. *Nolin Prod. Credit Association v. Canmer Deposit Bank,* 726 S.W.2d 693, 697 (Ky.App.1986)(concluding that under inquiry test, description is sufficient in a financing statement if it puts subsequent creditors on notice so that they may reasonably identify the collateral upon inquiry); 4 White & Summers, *supra,* § 31–18 at 208 (stating that the theory of notice filing is that a reasonably diligent searcher "will be put on notice not only of a security interest but also on notice of what collateral is covered by the security agreement").

Applying these principles, the Court finds that the financing statement in the instant case is sufficient to enable a reasonably diligent searcher aided by inquiry to identify the collateral as including the 1999 contract. Although perhaps not stated as precisely as possible, the phrase "and subsequent agreements thereto" certainly indicates a reference to something more than the 1996 contract. Therefore, M & P perfected a security interest in the 1999 contract between Fisher and Crawford on September 30, 1998.

## VI.

### UNION BANK OF BENTON'S CLAIM OF A PERFECTED SECURITY INTEREST

■ On April 13, 1999, Ace executed a promissory note in favor of Union Bank in the principal sum of $325,000.00. The note was signed "Ace Sports Management LLC by Elbert Crawford III, President/Manager." Crawford executed his personal guarantee of the note on the same date. Union Bank is now owed the sum of $451,451.26 as of July 20, 2001.

Crawford, in his individual capacity, executed a security agreement in favor of Union Bank of Benton dated April 13, 1999. (UBB Ex. 7). The collateral was described as Crawford's interest in "all the Debtor's present and future accounts, ... all additional amounts due to the Debtor from any customer or client, irrespective of whether such additional amounts have been specifically assigned to the secured party...." (UBB Ex. 7.) Crawford also executed an identical document on behalf of Ace Sports Management LLC on the same date.

Also on April 13, 1999, four financing statements were prepared by Union Bank and submitted to Crawford for signature. Two of the financing statements listed Ace Sports Management LLC as the debtor and were signed "Ace Sports Management LLC by Elbert Crawford III President." (UBB Exs. 5 and 6.) These financing statements were filed of record on April 13, 1999, with the Secretary of State and the Circuit Clerk of Pulaski County. The description of the collateral was the same as contained in the security agreements.

The other two financing statements listed the debtor as "Elbert Crawford" in the appropriate box on the form. However, both financing statements were signed "Ace Sports Management LLC by Elbert Crawford III, President". (UBB Exs. 8 and 9.)

NBA argues that Union Bank's security interest is unperfected because the financing statement upon which it bases its secured claim is not signed by the debtor/owner of the collateral but by the corporation Ace. Union Bank argues that the error in the signature is a minor error that is not seriously misleading and, thus, is effective pursuant to section 4–9–402(8) of the Arkansas Code.

One of the formal requisites of an effective financing statement is that it is

"signed by the Debtor ... " Ark.Code Ann. § 4–9–402(1) (Michie 1991 & Supp. 1999). As stated previously, "debtor" in this context refers to the entity that has rights in the collateral. Ark.Code Ann. § 4–9–203(1)(c)(Michie 1991 & Supp.1999).

■■■ A financing statement which is not signed by the Debtor is invalid. Failure to obtain the signature of the debtor is not a minor error within the meaning of the substantial compliance provision of the Arkansas Code, section 4–9–402(8). *Midlantic Nat'l Bank North v. Borg–Warner Acceptance Corp. (In re Mayo)*, 112 B.R. 607, 648 (Bankr.D.Vt.1990); *Multi–Photo Inc. v. Mark ·Twain Bank (In re Multi–Photo Inc.)*, 62 B.R. 159, 161 (Bankr.E.D.Mo. 1986); *Pischke v. Murray (In re Pischke)*, 11 B.R. 913, 923 (Bankr.E.D.Va.1981);*Guardian State Bank v. Lambert*, 834 P.2d 605, 608 (Utah App. 1992).

The other requirements of section 4–9–402 all address the question of adequacy of notice. In their treatise, White and Summers point out that the general provisions of the Uniform Commercial Code state that a signature is for the purpose of authentication. See 4 White and Summers, *supra*, § 31–18 at 200 (discussing the meaning of "signed" pursuant to section 1–201(39) of the Uniform Commercial Code).

■■■ The failure to obtain the debtor's signature on a financing statement is usually fatal to the validity of the statement. However, here the debtor signed, but in his corporate capacity and not as an individual. Unlike the document filed by River Valley, Union Bank's documentation includes a separate instrument in which the Debtor in his individual capacity gave Union Bank a security interest. The Debtor contemporaneously executed a security agreement and financing statement in the name of the corporation. All the circumstances present here lead to the obvious

conclusion that the error in the signature on the financing statement is a scrivener's error.

When the four financing statements and four security agreements are construed together, the policy reason for a signature on a financing statement (authentication) is fulfilled, and the error in signature is minor. *Lines v. National Cash Register Co. (In re Green Mill Inn, Inc.)*, 474 F.2d 14 (9th Cir.1973) (ruling that financing statement referring to individual debtor but signed with corporate signature substantially complied with section 9–402); *Plemens v. Didde–Glaser, Inc.*, 244 Md. 556, 224 A.2d 464 (1966)(holding that the purpose of financing statement signature is to authenticate the document and that corporate debtor's signature as individual did not destroy validity of the document).

Therefore, Union Bank perfected its security interest in the 1999 contract on April 13, 1999.

## VII.

## THE ASSIGNMENT TO RIVER VALLEY BANK

The parties have devoted a considerable amount of attention to the issue dealing with the purported assignment of the 1999 player/agent contract by Crawford to River Valley and Mrs. Johnson on September 1, 1999, as it affects Fisher's right of setoff.

The maximum amount Fisher will ever owe to Crawford is $840,000.00, and Fisher has established a right of setoff in the amount of $397,500.00 plus attorney's fees and costs. The amount remaining for the three banks with perfected security interests to divide is $442,500.00 or less, depending on the running of interest, award of attorney's fees and Fisher's decision on the last two years of his contract.

The issues surrounding the validity of the assignment are moot because there is no value to be distributed to claims of creditors who are unperfected. Ark.Code Ann. § 4–9–301(1)(a)(Michie 1991 & Supp. 1999). Three claims totaling $1,270,175.80 were perfected before the assignment to River Valley and Mrs. Johnson; therefore, Crawford had nothing left to assign when he assigned his interest in the 1999 contract on September 1, 1999. Neither Union Bank, NBA or M & P have any legal defense to Fisher's claim of setoff, and they are not involved in this dispute over the assignment.

## SUMMARY

Pursuant to the preceding discussion, M & P perfected its security interest in the 1999 contract between Fisher and Crawford on September 30, 1998, and has first priority to secure its claim for $171,693.03. Union Bank perfected its security interest in the 1999 contract between Fisher and Crawford on April 13, 1999, and has a second priority to secure its claim for $451,451.26. National Bank of Arkansas perfected its security interest in the 1999 contract between Fisher and Crawford on May 4, 1999, and has a third priority to secure its claim for $647.031.56. River Valley and Mrs. Johnson are unsecured creditors and have no security interest in the 1999 contract.

Fisher is indebted to Crawford in the minimum sum of $600,000.00 or the maximum sum of $840,000.00. These sums are due at the rate of $120,000.00 per year and payable in August of the year preceding the basketball season as the parties previously agreed.

Fisher is permitted the following setoffs:

a. $75,000.00 advanced December 1998

b. $120,000.00 advanced August 1999

c. $22,500.00 advanced November 1999

d. $180,000.00 in unauthorized transfers on November 18, 1999.

e. Attorney's fees and costs payable to Wright, Lindsey & Jennings as determined by the Court after notice and hearing.

IT IS SO ORDERED.